UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.H., a minor, by her guardian ad litem Chantal Holt, WILLIAM KENNETH HOLT and CHANTAL HOLT,<br><br>            Plaintiffs,<br><br>      v.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | No. CIV. S-11-1963 LKK DAD<br><br><br>**ORDER** |

The following is the court's opinion and order after trial.

In this case the plaintiffs allege medical malpractice on the part of United States Air Force medical personnel. (Amended) Pretrial Conference Order (Final), Undisputed Facts ("Facts") (ECF No. 82) ¶ 1. Jurisdiction is predicated upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346.

Plaintiff SH is a minor child who suffers from cerebral palsy. Facts ¶¶ 33-35. Plaintiffs' claim is that United States Air Force medical personnel committed malpractice during their treatment of plaintiff Chantal Holt – SH's mother – Edwards Air Force Base in California (U.S.A.).

1   Specifically, plaintiffs assert that even though Air Force

2   medical personnel provided care for, or were aware of Chantal's

3   two premature deliveries, and one miscarriage, they (1) failed to

4   warn Chantal about the added dangers she faced during her then-

5   current pregnancy with SH, (2) failed to prepare her for those

6   dangers, and (3) failed to caution her against traveling overseas

7   to a facility that was not equipped to handle those dangers.

8   Plaintiffs further assert that this malpractice was the proximate

9   cause of SH's premature birth and resulting cerebral palsy.

10   The government's principal defense is that even if

11   plaintiffs were the victims of malpractice by Air Force medical

12   personnel in the U.S., their injury occurred in Spain – where SH

13   was born – and therefore the case falls within the "foreign

14   claim" exception to the FTCA, 28 U.S.C. § 2860(k), depriving this

15   court of jurisdiction.  Alternatively, the government argues that

16   Mr. Holt's claim for emotional distress is barred by the <u>Feres</u>

17   doctrine (<u>Feres v. U.S.</u>, 340 U.S. 135, 146 (1950)).  The

18   government also asserts that its medical personnel did not commit

19   malpractice against plaintiffs, and that there was no causation

20   or damages for which it is liable.

21   For the reasons set forth below, the court finds that the

22   foreign claim exception does not apply here, and that plaintiffs

23   have proven their case on the merits.  Accordingly, judgment will

24   be entered in plaintiffs' favor.

25   **I.    JURISDICTION – THE FEDERAL TORT CLAIMS ACT**

26   **A.    The Law**

27   Because the government's principal defense is

28   jurisdictional, the court addresses it first.  The Federal Tort

2

1  Claims Act ("FTCA"), 28 U.S.C. §§ 1346 & 2671-80, inter alia,

2  grants exclusive jurisdiction to the federal district courts, for

3  civil actions asserting:

> claims against the United States, for money
> damages … for … personal injury … caused by
> the negligent or wrongful act or omission of
> any employee of the Government while acting
> within the scope of his office or employment,
> under circumstances where the United States,
> if a private person, would be liable to the
> claimant in accordance with the law of the
> place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  By its terms the FTCA also makes a

sweeping waiver of the government's sovereign immunity in such

cases. 28 U.S.C. § 2674 ("The United States shall be liable,

respecting the provisions of this title relating to tort claims,

in the same manner and to the same extent as a private individual

under like circumstances"); U.S. v. Yellow Cab Co., 340 U.S. 543,

547 (1951) (the FTCA "waives the Government's immunity from suit

in sweeping language"); Millbrook v. U.S., 569 U.S. ___, 133

S. Ct. 1441, 1442 (2013) (FTCA "waives the Government's sovereign

immunity from tort suits").

     However, the waiver of sovereign immunity is not all-

encompassing.  The FTCA's waiver does not apply to "[a]ny claim

arising in a foreign country."  28 U.S.C.A. § 2680(k); U.S. v.

Spelar, 338 U.S. 217, 218 (1949) ("The Federal Tort Claims Act is

inapplicable by its terms to 'any claim arising in a foreign

country'").

     The purpose of this exemption is to ensure that the United

States would not be subject to tort liability as determined by

the law of a foreign country:

> [T]hough Congress was ready to lay aside a

1
2
3

> great portion of the sovereign's ancient and
> unquestioned immunity from suit, it was
> unwilling to subject the United States to
> liabilities depending upon the laws of a
> foreign power.

4  Spelar, 338 U.S. at 221; Nurse v. U.S., 226 F.3d 996, 1003 (9th

5  Cir. 2000) ("[t]he purpose of the exception is to ensure that the

6  United States is not exposed to excessive liability under the

7  laws of a foreign country over which it has no control").

8       In this Circuit, and even in the Supreme Court, the "foreign

9  law" problem was avoided simply by applying the FTCA as it was

10  written.  Specifically, liability was determined by the law of

11  the place where the negligent act or omission occurred.  See 28

12  U.S.C. § 1346(b)(1) (granting federal jurisdiction in cases where

13  the United States shall be liable "under circumstances where … a

14  private person, would be liable to the claimant in accordance

15  with the law of the place where the act or omission occurred")

16  (emphasis added);[1] Richards v. U.S., 369 U.S. 1, 9 (1962) ("[i]n

17  the Tort Claims Act Congress has expressly stated that the

18  Government's liability is to be determined by the application of

19  a particular law, the law of the place where the act or omission

20  occurred").

21       Under this simple rule, an FTCA claim "arises" in the place

22  where the negligent act or omission occurs – not necessarily in

23  the place where the injury or damage occurs – and that is also

24  the place whose law governs.  See Cominotto v. U.S., 802 F.2d

25  ---

[1] Accord, 28 U.S.C. § 2674 ("If, however, in any case wherein
26  death was caused, the law of the place where the act or omission
complained of occurred provides … for damages only punitive in
27  nature, the United States shall be liable for actual or
compensatory damages …").

28

1127, 1129-30 (9th Cir. 1986) ("[u]nder section 2680(k), a tort

claim arises in the place where the negligent act or omission

occurs, not necessarily at the site of the injury or the place

where the negligence has its 'operative effect'");[2] accord,

Richards, 369 U.S. at 10 (expressly rejecting the argument that

"that Congress intended the words 'act or omission' to refer to

the place where the negligence had its operative effect," and

that therefore the law of that place should determine liability).

Under this simple rule, grounded in the language of the

governing statute, when negligent or wrongful conduct occurs

entirely in the United States, the foreign claim exception would

not apply, since liability is governed by the law of the state

where the negligence or wrongful conduct occurred, even if the

damage or injury occurred in a foreign country.  See, e.g., Leaf

v. United States, 588 F.2d 733 (9th Cir. 1978) (section 2680(k)

does not exempt U.S. from liability for negligence in this

country which was alleged to have caused airplane damage in

Mexico).[3]

This rule had the advantage of guaranteeing that foreign law

could never be applied to determine the liability of the United

States under the FTCA, exactly Congress's concern in enacting the

foreign claim exception.  That is because the rule had two parts:

first, the claim arises where the negligent act or omission

occurred; and second, liability was also determined by the law of

the place where the negligent act or omission occurred.

---

[2] Abrogated by Sosa v. Alvarez-Machain, 542 U.S. 692, 702 (2004).

[3] Abrogated by Sosa.

1    Therefore, if the negligence occurred in the United States, no

2    matter where the injury occurred, liability would be determined

3    by local law within the United States, and the foreign claim

4    exception would not apply.  Similarly, if the negligence occurred

5    outside the United States, even if the injury occurred within the

6    United States, liability would be determined by foreign law, and

7    the foreign claim exception would apply.

8       In <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 69, 707 (2004), the

9    Court again recognized that "[t]he application of foreign

10    substantive law … was … what Congress intended to avoid by the

11    foreign country exception."  Nevertheless, <u>Sosa</u>, without

12    overruling <u>Richards</u>, swept aside the rule – anchored in the

13    statute and <u>Richards</u> – that an FTCA claim "arises" where the

14    negligent act or omission occurs.  In its place, <u>Sosa</u> declared

15    that "the FTCA's foreign country exception bars all claims based

16    on any injury suffered in a foreign country, regardless of where

17    the tortious act or omission occurred."  <u>Sosa</u>, 542 U.S. at 711.

18       However, <u>Sosa</u> did not change the rule that liability is

19    determined by the place where the negligence occurred.  It thus

20    appears to have created the precise situation the Congress tried

21    to avoid in enacting the FTCA.  Specifically, if the injury is

22    suffered in the United States, then the claim is not barred by

23    the exception even if the negligence occurred entirely in a

24    foreign country, and even though foreign law presumably would

25    apply.  Conversely, if the negligence occurred entirely in the

26    United States, but the injury occurred in a foreign country, then

27    even though U.S. law would determine liability, the claim is

28    barred under <u>Sosa</u>.  <u>Sosa</u> went on to expressly reject the argument

1  that the exception should not apply in a situation where U.S. law

2  would determine liability for domestic negligence resulting in

3  injury in a foreign country.  Sosa, 542 U.S. at 710-11.

4      Because "the FTCA's foreign country exception bars all

5  claims based on any injury suffered in a foreign country,

6  regardless of where the tortious act or omission occurred," Sosa,

7  542 U.S. at 711, this case will be barred if, as the government

8  asserts, the complained-of injury occurred in Spain.  As this

9  court has previously determined, however, the burden of

10  establishing that the injury occurred in Spain – and that the

11  foreign claim exception therefore applies – lies with the

12  government.  See ECF No. 59 at 13-14 (order denying summary

13  judgment).  The court therefore turns to the evidence regarding

14  that matter, namely, whether the government has established that

15  plaintiffs' injuries occurred in Spain.

16      **B.    Undisputed Jurisdictional Facts.**

17          1.    Plaintiff SH was born May 12, 2005, at Puerto Real

18  Hospital in or around Cadiz, in Southern Spain.  Facts ¶¶ 33

19  & 34.

20          2.    Plaintiff SH was born at approximately 31 weeks

21  gestation.  Facts ¶ 98.

22          3.    Plaintiff SH exhibited normal "Apgars" blood

23  gasses at birth.  Facts ¶ 99.

24          4.    Plaintiff SH exhibited signs of prematurity,

25  including difficulty eating and breathing.  Facts ¶ 100.

26          5.    Plaintiff SH had to be intubated while in the

27  hospital.  Facts ¶ 101.

28          6.    Plaintiff SH was kept in the neonatal intensive

1   care unit ("NICU") for seventeen days.  Facts ¶ 102.

2          7.   Plaintiff SH was released from Puerto Real

3   Hospital on or about May 30th.  Facts ¶ 105.

4          8.   Plaintiff SH was evaluated at the Landstuhl

5   Medical Center, in Germany, by Dr. L. Smith.  Facts ¶ 110.

6          9.   Plaintiff SH was evaluated by two other doctors in

7   Spain.  Facts ¶ 111.

8          10.  Plaintiff SH underwent an Electro-encephalogram

9   (EEG) while in Spain due to concern about seizures.  Facts ¶ 112.

10          11.  While in Spain, Plaintiff SH was prescribed anti-

11   seizure medication.  Facts ¶ 113.

12          12.  The MRI showed that Plaintiff SH had

13   Periventricular Leukomalacia ("PVL").  Facts ¶ 114.[4]

14          13.  Upon arriving back in the United States, Plaintiff

15   SH was seen at the Medical University of South Carolina ("MUSC")

16   in Charleston.  Facts ¶ 122.[5]

17          14.  SH had access to and received specialty care while

18   in Charleston, South Carolina.  Facts ¶ 115.

19          15.  In late-2006, Plaintiff SH was found to have

20   tetraplegia of all four extremities and other deficits.  Facts

21   ¶ 123.

22          16.  Plaintiff SH was definitively diagnosed with

23   cerebral palsy at the approximate age of 2 years old.  Facts

24   ¶ 116.

25   [4] The MRI was done while plaintiffs were still in Spain.  TR 240

26   (Ms. Holt testimony).

27   [5] Plaintiffs were in Spain "through June 2006," and thereupon
     moved to South Carolina (U.S.A.).  TR 252 (Ms. Holt testimony).

28

17.  Cerebral Palsy is not a disease, but a grouping of non-progressive, non-contagious motor conditions that cause physical disability in human development.  Facts ¶ 117.

18.  Because of her cerebral palsy, Plaintiff SH is significantly disabled.  Facts ¶ 118.

19.  Plaintiff SH has undergone several surgeries as a result of her cerebral palsy.  Facts ¶ 119.

20.  Plaintiff SH will be disabled for life.  Facts ¶ 120.

21.  Plaintiff SH's premature birth is the cause of her cerebral palsy.  Facts ¶ 121.

22.  Plaintiff SH cannot walk without assistance. Facts ¶ 125.

23.  Plaintiff SH has significant cognitive impairment. Facts ¶ 126.

24.  Plaintiff SH has significant mobility impairment. Facts ¶ 127.

25.  Plaintiff SH has significant vision impairment. Facts ¶ 128.

26.  Plaintiff SH will not be able to have gainful employment.  Facts ¶ 129.

**C.   Evidence Regarding Jurisdictional Facts.**

The government argues that SH's injury occurred in Spain because (1) plaintiffs seek damages from "'the day she [SH] was born,'" ECF No. 174 at 7, (2) plaintiffs' required administrative tort claim, filed while plaintiffs were still in Spain, establishes that they are seeking damages for injuries occurring Spain, and (3) the evidence at trial shows that SH's injury

9

1   occurred in Spain.

2           **1.  Damages.**

3      The government asserts that Ms. Holt testified that she was

4 claiming damages for SH's injury "'from the day she [SH] was

5 born.'"  ECF No. 174 at 7.  In fact, Ms. Holt withdrew that

6 statement immediately upon uttering it, and instead testified

7 that she did not know what period of time she was seeking damages

8 for:

9           Q. Are you claiming damages for the time that
          you've had to spend taking care of [SH] in
10           this case?

11           A. Yes, sir.

12           Q. Starting from when?

13           A. From the beginning.

14           Q. From the day she was born?

15           A. I would say so. Yes, sir.

16           Q. From the day she was born?

17           A. <u>I don't know. I honestly don't know.</u> I
          would have to see the thing [the Jeannie
18           McNulty (economist) report]. I just -- since
          I haven't seen it, I –
19

20 TR 114.  Thus, Ms. Holt gave two different answers to the

21 question the government quotes, namely, "[f]rom the day she was

22 born?"  Although she initially answers "Yes, sir," she then

23 immediately withdrew her answer, by stating, in response to the

24 same, repeated, question, "I don't know.  I honestly don't know."

25 In other words, Ms. Holt was confused, and did not know what the

26 answer to the question was, notwithstanding her prior answer,

27 which only reflected her confusion.  The court accordingly

28

1   rejects the government's assertion that Ms. Holt's testimony on

2   this issue compels the conclusion that plaintiffs' injury and

3   resulting damages occurred in Spain.

4       The government next asserts that plaintiffs' economic

5   expert, Jennie McNulty, calculated damages from when SH was born,

6   in Spain, and concludes that the injury and resulting damages

7   therefore arose in Spain.  ECF No. 174 at 7.  The government is

8   correct that this was the stated basis for the expert's damages

9   calculation.  However, the government does not explain why this

10  supports its conclusion that the calculation bars plaintiffs'

11  entire claim.  At most, the expert's testimony shows that

12  plaintiffs are seeking damages beyond what they are entitled to.

13  That is, since plaintiffs assert that the injury occurred in

14  South Carolina, they will have some difficulty in explaining why

15  their damages should be calculated from a time that precedes

16  their presence in South Carolina.  However, there is no basis for

17  this court to conclude that even if plaintiffs are seeking more

18  damages than they are entitled to, that they are therefore

19  entitled to no damages whatever.  The court accordingly rejects

20  the government's assertion that McNulty's damages calculation

21  establishes that plaintiffs' claim "arose in Spain and is barred

22  by § 2680(k)."  See ECF No. 174 at 7.

23          **2.   The Administrative Claim.**

24      The government next asserts that plaintiffs' lawsuit is

25  barred by the foreign claim exception because the administrative

26  claim relating to this lawsuit was "signed and submitted" on or

27  about June 9, 2006, while the plaintiffs were still living in

28  Spain.  ECF No. 174 at 8.  The administrative claim sought money

11

1   damages for, among other things, "catastrophic neurological

2   injuries," "seizures," and "cerebral palsy."  <u>See</u> Exh. 3T

3   (admitted RT 262) at second (unnumbered) page.  The claim

4   requested $100 million in personal injury damages.  <u>Id.</u>, at first

5   page.  That administrative claim is for the damage on which this

6   case is now based.  TR 664 (Ms. Holt testimony).

7       The government therefore argues that plaintiffs have

8   submitted a claim for an injury arising in Spain, and is

9   therefore barred by the foreign claim exception, a jurisdictional

10   bar.  It goes on to argue that if plaintiffs are seeking damages

11   for a claim that arose in South Carolina, they failed to file an

12   administrative claim for it, and therefore are jurisdictionally

13   barred by their failure to exhaust their administrative

14   remedies.[6]

15       Plaintiffs do not agree that the claim form establishes that

16   the injury occurred in Spain.  Rather, they assert that the claim

17   forms were prepared by plaintiffs' counsel in an attempt to

18   preserve plaintiffs' rights, including making sure that they did

19   not lose their claims to the statute of limitations.  Since the

20   presentation of an administrative claim is jurisdictional, it is

21   plaintiffs' burden to establish that they met the administrative

22

23   [6] The court notes that this argument, although jurisdictional, is
    an afterthought by the government.  The government sought summary
24   judgment in this case without ever raising this issue.  It argued
    that the injury occurred in Spain, but did not identify these
25   administrative claim forms as the basis for the argument until
    trial, even though the government has had the forms since June
26   2006.  Nevertheless, since the issue goes to federal
    jurisdiction, the court will consider the argument, even at this
27   late date.

28

1    claim requirement of the FTCA.  See Cadwalder v. U.S., 45 F.3d

2    297, 300-01 (9th Cir. 1995).

3        The FTCA waives the government's immunity for tort claims

4    only if the plaintiff has first "presented" the claim to the

5    appropriate federal agency and been turned down.  28 U.S.C.

6    § 2675(a).  This court is required to interpret the

7    Section 2675(a) waiver of federal sovereign immunity "strictly."

8            "[T]he administrative claim requirements of
             Section 2675(a) are jurisdictional in nature,
9            and thus must be strictly adhered to.  This
             is particularly so since the FTCA waives
10           sovereign immunity.  Any such waiver must be
             strictly construed in favor of the United
11           States.  Section 2675(a) establishes explicit
             prerequisites to the filing of suit against
12           the Government in district court.  It admits
             of no exceptions. Given the clarity of the
13           statutory language, we cannot enlarge that
             consent to be sued which the Government,
14           through Congress, has undertaken so carefully
             to limit."

15

16   Cadwalder, 45 F.3d at 300-01 (quoting Jerves v. U.S., 966 F.2d

17   517, 521 (9th Cir. 1992)).

18       It is undisputed that plaintiffs "presented" their FTCA

19   claim to the Air Force in June 2006, while they were still living

20   in Spain.  First Amended Complaint (ECF No. 6) ¶ 4; Answer ¶ 4;

21   RT 252 (Ms. Holt testimony; plaintiffs were in Spain "at least

22   through June" of 2006).  The government's argument is that this

23   fact, standing alone, establishes that SH's injury occurred in

24   Spain.  However, the government cites no case for this

25   proposition, and the court cannot agree with it.

26       The FTCA administrative claim is intended to enable the

27   government to make its own investigation, and to alert it to a

28
                                    13

1   request for a sum certain in damages.  <u>See</u> <u>Cadwalder</u>, 45 U.S. at

2   301.  The Holts' administrative claim does just that in this

3   case.  It alerts the Air Force that plaintiffs were claiming

4   negligence by Air Force medical personnel at Edwards Air Force

5   base, by, generally speaking, failing to warn and prepare

6   Ms. Holt for the dangers her fourth pregnancy presented, given

7   her two prior premature births and one miscarriage.  It further

8   alerts the Air Force that this alleged negligence resulted in

9   $100 million in damages to the plaintiffs as the direct and

10  proximate result of the premature birth.  It further alerts the

11  Air Force of all the possible consequences of its alleged

12  negligence, including "cerebral palsy," and the sum certain that

13  plaintiffs were claiming.

14       The government seems to be arguing that the administrative

15  claim form is an admission by plaintiffs that the injuries

16  identified in the form had already occurred in Spain, since the

17  form was sworn to by plaintiffs, and was prepared with the

18  assistance of counsel.  At trial, counsel for the government

19  pointed out to Ms. Holt that there could be a "civil penalty"

20  attached to signing the form falsely.  TR 263.

21       However, this form, Exhibit 3T, is not what the government

22  says it is.  Exhibit 3T is an administrative claim form.  It does

23  require the claimant to set forth the "basis of claim," in other

24  words:

25               state in detail the known facts and
                 circumstances attending the … injury, …
26               identifying persons … involved, the place of
                 occurrence and the cause thereof.
27
    Exh. 3T ¶ 8.  It also requires the claimant to
28

14

1       state the nature and extent of each injury …
        which forms the basis of the claim.
2

3  Exh. 3T ¶ 10.

4       Contrary to the clear implication of the government's

5  assertion however, the certification portion of the document does

6  not require the claimant to swear that every identified injury

7  was known to exist at the time of signing.  Rather, it states

8  only:

9       I certify that the amount of claim covers
        only damages and injuries caused by the
10      incident above and agree to accept said
        amount in full satisfaction and final
11      settlement of this claim.

12 Exh. 3T ¶ 13a.  In other words, the Holts' signature signaled

13 only their agreement to limit their damage claim to whatever was

14 included on the claim form.  Thus, even if cerebral palsy had not

15 yet occurred, the parents had to include a claim for it, or they

16 would be forever barred from seeking damages if or when it did

17 occur, so long as it arose from the negligence identified in the

18 form.  Indeed, in this specific case, the parents – and their

19 counsel who is the person who actually completed this form (TR

20 264) – must reasonably have believed that they were required to

21 list cerebral palsy on the claim form, since one doctor had told

22 them that in his view, SH already had cerebral palsy.  Plaintiffs

23 now assert that this information, from Dr. Shales, was erroneous,

24 as discussed below, but they could hardly have been expected to

25 ignore it when filling out their administrative claim form.

26 Failure to list an injury that had already been identified by

27 their doctor – even if he did so in error – would possibly have

28 forever barred the plaintiffs from seeking damages for cerebral

1   palsy after it actually did occur, so long as it arose from the

2   negligence alleged in the claim form.

3       Moreover, even if the parents did <u>believe</u> that SH had

4   cerebral palsy in Spain, and stated so on the claim form, that is

5   not an "admission" that SH had cerebral palsy.  Whether SH had

6   cerebral palsy in Spain is a medical question which this court

7   will resolve based upon the medical evidence adduced at trial,

8   not based upon whatever belief (mistaken or not) the parents may

9   have had at the time they signed the claim form.

10      Plaintiffs' form accordingly tells us nothing when it comes

11  to the foreign claim exception.  What it does tell us is that

12  plaintiffs listed every conceivable injury that their lawyer

13  conceived could possibly result from the negligence alleged in

14  the form.  It does not admit that those injuries have already

15  occurred, nor does it admit that the injuries occurred in Spain.

16  The claim form, and the plaintiffs' signature thereon, only

17  serves to give the government notice of the alleged negligence,

18  the possible injuries and the claimed monetary damages, so that

19  the government can investigate, and that is all.  Having

20  fulfilled its statutory purpose, the administrative claim does

21  not resurrect itself at trial to trap unwary litigants into

22  making admissions about where an injury occurred for purposes of

23  the foreign claim exception.

24      The government's fallback position is that if the cerebral

25  palsy occurred in South Carolina, then this lawsuit is barred

26  because plaintiffs did not file a separate administrative claim

27  to cover it.  <u>See</u>, ECF No. 174 at 9.  However, the government

28  identifies no case or statute indicating that a new claim is

required even when the claim for damages from cerebral palsy is in the claim that was presented, and the cerebral palsy arises from the same negligence as was already identified in the claim.

The court finds that the government was already put on notice that its medical personnel negligently treated Ms. Holt, that their negligence resulted in premature birth in a location not equipped to handle it, and that cerebral palsy and its resulting monetary damages, was among the possible injuries that could result from this negligence.  No additional or subsequent administrative claim was required for this lawsuit to proceed.[7]

### 3.   The evidence at trial.

The government asserts that the evidence at trial "conclusively establishes" that SH was injured in Spain.  ECF No. 174 at 9.  The government first points to the undisputed facts that SH "exhibited signs of prematurity, including difficulty eating and breathing," "had to be intubated while in the hospital," "was kept in the neonatal intensive care unit for seventeen days," and was diagnosed with esotropia.  See ECF No. 147 at 9-10; Facts ¶¶ 100-02.  The government concludes, as to those facts, "[t]hese are injuries."  ECF No. 147 at 10.  They may well be injuries, but they are not the injuries that plaintiffs are suing over.  Nothing in plaintiffs' administrative

---

[7] Plaintiffs allege in their complaint (ECF No. 6) and argue in their post-trial brief that medical personnel at Travis AFB and Landstuhl military base were negligent by failing to warn Ms. Holt of the dangers she faced in future pregnancies. However, the administrative claims they presented to the government alert the government to alleged negligence only at Edwards AFB.  See Exhibit 3T.  Accordingly, any claims based upon negligence at Travis or Landstuhl are jurisdictionally barred.

1  claim nor their Complaint alleges that those matters are injuries

2  for which they seek compensation.[8]  They need not be considered

3  further.

4      The government next points to evidence that, it believes,

5  shows that SH "suffered seizures or involuntary shaking of the

6  leg," that the "seizures" were frequent and getting worse in

7  Spain, that SH was placed on powerful anti-seizure medication

8  while in Spain, and that "seizures are an injury."  ECF No. 147

9  at 10.  An examination of the evidence the government identifies

10  for this proposition however, does not reveal evidence showing

11  "conclusively" that SH had "seizures" in Spain.

12      The undisputed facts show that Ms. Holt noticed "shaking in

13  Plaintiff SH's leg while still in Spain."  Facts ¶ 109.  This

14  does not establish that there was any "involuntary" shaking, nor

15  does it establish that the shaking was a "seizure."  The

16  government cites the testimony of Dr. Delgado, TR 606, for its

17  assertion that the "seizures" were frequent and getting worse.

18  ECF No. 147 at 10.  However, Dr. Delgado's cited testimony does

19  not refer to any "seizures."  Rather, he states that Ms. Holt

20  reported "unusual movements" in SH's legs.  TR 604.  In response,

21  Dr. Delgado told Ms. Holt that the movements "had the <u>potential</u>

22  _____

[8]  Indeed, the uncontested testimony in this case is that
23  "esotropia," which is "a problem with muscle control of the
eyes," is "[v]ery common in preterm infants," and is seen "a lot
24  in preterm babies who have <u>no evidence of injury</u>," and "<u>no</u>
<u>neurologic deficit</u>."  TR 70-71 (testimony of Dr. Null) (emphasis
25  added).  Moreover, Mr. Holt also has this condition, and the
Holts apparently do not view it as an injury or anything to sue
26  over.  <u>See</u> TR 256 (Ms. Holt testimony: "My husband had it
[esotropia], too"); 424 (Mr. Holt testimony: "I have it
27  [esotropia]").

28

1   to be <u>consistent</u> with a seizure, and that the information she

2   would provide me would help me figure that out."   TR 605

3   (emphases added).   Dr. Delgado further testified that he ordered

4   "standard studies to look for seizure activity, an EEG, a brain

5   MRI, and consultation with a pediatric neurologist," and that he

6   "did prescribe something called phenobarbital, which is an anti-

7   seizure medication."   TR 605.   In other words, Dr. Delgado

8   thought that the leg movements reported by Ms. Holt could

9   possibly be seizures, and that the proper course was to take

10  tests to make a determination, and in the meantime, to prescribe

11  phenobarbital.[9]

12      The government goes on to argue that "the Holts knew that

13  something was 'wrong' with S.H." while they were still in Spain.

14  ECF No. 174 at 10, citing TR at 662:15-18.[10]   The government's

15  argument implies that the Holts themselves testified that they

16  knew that something was "wrong" with SH while they were still in

17  Spain.   Yet, the cited testimony does not state that.   To the

18  contrary, when Ms. Holt was asked when she got "an indication

19  that something might be wrong with Sarah," she testified, "I

20  brought up a, like, a shaking in her leg, and <u>I just wasn't</u>

21  <u>sure</u>."   TR 662:15-18.   Thus, Ms. Holt's testimony is that she

22  _____

23  [9] Dr. Paul Shales, meanwhile, when asked if he told the Holts
    that SH "had neonatal seizure disorder <u>that was probably</u>
24  <u>resolved</u>," testified, "I did."   TR 793-94 (emphasis added).   The
    government also neglects to mention that SH was "completely
25  weaned off of phenobarbital" by June 2006, while plaintiffs were
    still in Spain.   <u>See</u> Exh. X at US_002057 ¶ 7.

26  [10] The government cites "TR. 622:11-14," which appears to be a
27  typographical error for "TR. 662:15-18."   There is no testimony
    from the Holts on page 622 of the trial transcript.

28

1  "wasn't sure" if something might be wrong with SH, not that "she

2  knew that something was wrong."  See ECF No. 147 at 10 (emphasis

3  added).

4      Moreover, even though the government asserts that "the Holts

5  knew" that something was wrong with Sarah while they were still

6  in Spain, it fails to direct the court's attention to Mr. Holt's

7  testimony on this point, even though "the Holts" refers to both

8  parents.  In fact, when asked, "Isn't it true that you knew

9  something was wrong with her [SH] even if you weren't sure quite

10  what it was," Mr. Holt answered:

11          No.  Again, you're – I think you're implying
           that we knew at that point that there was a
12          life-long condition.  No.  The answer is no.

13  TR 424:25 to 425:4 (emphases added).[11]  "The Holts" did not

14  testify that they knew that something was wrong with SH while

15  they were still in Spain.

16      The government next identifies a purported admission by the

17  Holts that "S.H. had developmental delays in Spain, which they

18  listed as 'severe' when they enrolled her in the Air Force's

19  special needs program, still in Spain."  ECF No. 147 at 10

20  (emphasis added), citing Exhibit 2V and TR 540:1-22.  In fact,

21  _____

22  [11] Counsel has a duty of candor to the court.  See, e.g., Campbell
    v. Rice, 408 F.3d 1166, 1175 (9th Cir.) ("A prosecutor, like all
    attorneys, also owes a duty of candor toward a court"), cert.
23  denied, 546 U.S. 1036 (2005).  The court believes that that duty
    is not well served by placing a word in quotation marks and
24  attributing it to a witness who did not actually utter it, and
    who did not adopt the word in her answer to the question where
25  the word was used.  In addition, the court believes that counsel
    should not attribute a quotation to two persons, while citing
26  only to the testimony of one of those persons, especially when
    the testimony of the second person directly contradicts counsel's
27  assertion.

28

1    Exhibit 2V contains no such admission by the Holts.  Mr. Holt's

2    signature on the form is only to identify him as the "sponsor"

3    who is authorizing "the release of information" about SH "to

4    personnel of the Military Departments."  Exh. 2V at US_002548

5    ¶ 1(a)-(d).  Elsewhere on the form is an assertion that SH is

6    eligible for the program because she has "developmental delay"

7    described as "severe."  Id., ¶ 4(b) & 5.  However, that assertion

8    is made by Leslie Fox, an "Early Intervention Specialist," and

9    signed by Fox, not by Mr. or Ms. Holt.  Id., ¶ 6(a) ("name of

10   individual completing this section"), (b) & (i).  It is simply

11   false to assert that this is an admission by the Holts.[12]  The

12   government's reference to Mr. Holt's testimony at TR 504:1-22

13   adds nothing, because it is simply Mr. Holt describing the form

14   and the entries thereon which, as pointed out, were completed by

15   Ms. Fox and contain her assertions, not his.  See TR 504:1-22.

16        The government next asserts that the Holts "knew that an MRI

17   in Spain showed that S.H. had periventricular leukomalacia or

18   'PVL' … which Plaintiffs' expert Dr. Null testified was 'evidence

19   of some injury to the white matter' of the brain."  ECF No. 174

20   at 10, citing Facts ¶ 114 and TR 73:3-6.  It is uncontested that

21   SH had an MRI while the Holts were still in Spain.[13]  The

22   _____

23   [12] It is additionally false for the government to assert that
     "they" made this admission, since Ms. Holt's name and signature
24   are nowhere on this form, and there is no reference to her at
     all.

25   [13] The government's citation to Facts ¶ 114 does not establish
26   this, as that undisputed fact does not state where the MRI was
     conducted.  However, the uncontested trial testimony establishes
27   that the MRI was taken in Spain.  See, e.g., TR 240:15-19 (the
     "first MRI" was taken in Spain).

28

government is correct that, according to the undisputed facts,
the MRI, taken in Spain, "showed that Plaintiff SH had
Periventricular Leukomalacia ('PVL').  Facts ¶ 114.[14]  However,
besides defining what PVL means, the government never establishes
that this is an injury that plaintiffs are suing over in this
case.  To the contrary, the uncontested testimony of plaintiffs'
expert, Dr. David Griesemer, when asked whether the PVL report
was "significant evidence of some sort of problem that the child
is going to have or presently has," answered:

> No. I think everyone was very cautious not to
> equate this finding with something that would
> be necessarily problematic later.  I think
> the best we get out of anyone, whether it's
> the radiologist or the neurologist, is this
> is something that needs to be followed up, we
> need to look at it later.  It is clearly not
> a clear prediction of her later diagnosis of
> cerebral palsy.

TR 316-17 (emphases added).

The government next asserts that SH had "abnormal physical
limitations," and a "litany of 'medical problems,'" requiring her
to see "'lots and lots of doctors,'" while still in Spain.  ECF
No. 147 at 10, citing Mr. Holt's testimony at TR 424:4-14 and
425:23-426:4.  Once again, the cited testimony does not say what
the government claims.  First, Mr. Holt did not testify that SH
had a "litany" of medical problems, rather he answered "Sure,"
when asked whether SH "had at least medical problems in Spain."
TR 425:23-426:1.  He did testify that SH saw "lots and lots of

---

[14] This concession by plaintiffs is surprising however, since
their own expert testified that "everyone was sort of hedging
around" the question of whether Sarah had a diagnosis of PVL, and
that while "the findings are consistent with [PVL], … it's not
clearly asserted. … And this was pretty mild and iffy."  TR 316.

1  doctors" in Spain.   TR 426:2-4.   However, the plaintiffs are not

2  suing under the FTCA because SH had unspecified "medical

3  problems" or because she saw lots and lots of doctors; they are

4  suing over the catastrophic medical problems they say arose after

5  they returned to the United States, and the life-long medical and

6  other care they claim she will require.

7       Second, Mr. Holt's cited testimony at 424:4-14 does not

8  assert that SH had "abnormal physical limitations," and in fact,

9  he specifically denies that:

10              Q. Isn't it true that you understood that she
                had physical limitations while you were in
11              Spain?

12              THE  COURT:  You  mean  physical  limitations
                different than a child, a newborn child?
13
                MR. BRODERICK: Yes, sir.
14
                THE COURT: Did you know that?
15
                THE  WITNESS: I  think  so.  Again,  Your  Honor,
16              we didn't know exactly what was going on. Not
                that  we  didn't  even  know  exactly  what  was
17              going  on,  but  nobody  really  could  tell  us
                specifically,  or,  you  know,  they  couldn't
18              tell  us  whether  she  had  developmental  and
                physical  delays  that  were  consistent  with  a
19              child  that  was,  you  know,  two  months
                premature,  or  were  they  consistent  with  a
20              child with an actual problem.

21              Did  she  have  developmental  delays?  Yes,
                that's  fair.   But  I  mean,  again,  she  had
22              episodes,  and  she  was  on  phenobarbital,  and
                that  could  be  part  of  that.   I  mean,  we  just
23              -- nobody knew what was going on.

24  TR 424 (testimony of Mr. Holt).

25       The government next asserts that "the Holts testified" that

26  "they knew that S.H. was 'not developing like her other two

27  siblings had,' even though the other siblings were also

28
                                23

premature." ECF No. 147 at 10, citing TR 774:19-21.[15] Once again, the cited evidence is not quite as the government describes it. First, the cited testimony is from Dr. Shales, not "the Holts." Second, the Holts were never called to testify as doctors nor as expert witnesses on child development. Accordingly, their apparent concern about SH's development, as reported to Dr. Shales, does not move the case forward at all on whether SH had cerebral palsy while still in Spain.[16]

The government next relies on SH's referral to "Early Development Intervention Services," and the conclusions contained in Exhibit D, an "Early Intervention Developmental Evaluation." ECF No. 147 at 10. The government asserts that SH was referred for these services based on her "manifest problems in Spain." Id. The cited testimony however, establishes that Dr. Delgado referred SH for those services, but it does not establish what problems were the basis for the referral. See TR 607:10-12. The court does not know that the government is referring to when it

_____

[15] The government cites "Tr. at 775:17-23," which appears to be a typographical error.

[16] Indeed, the government's repeated reliance on observations and admissions of the Holts makes for a very unconvincing case on this issue. As the government itself asserts, the question on the foreign claim exception is where the claim occurred. Yet, the government repeatedly relies on observations or concerns from the parents, even though it has offered no basis for the court to conclude that the Holts could possibly make the medical determination of when or where the injury occurred. The court notes that Ms. Holt is currently enrolled in school, aiming to get into pharmacy school. TR 82 (Ms. Holt testimony). There is no evidence that she is a doctor. Mr. Holt is in "aircraft maintenance." TR 386 (Mr. Holt testimony). There is no evidence that he is a doctor.

1    refers to "manifest problems."  However, Dr. Delgado's testimony

2    immediately prior to his referral testimony concerned Ms. Holt's

3    concerns about SH's leg shaking, eye movements, and whether SH

4    was achieving development milestones according to the "standard

5    timeline based upon her age."  None of these things identify

6    "injuries" that plaintiffs are suing over.  The leg shaking and

7    eye movement issue ("esotropia") are discussed above.  There is

8    nothing in the cited testimony, or the testimony leading up to

9    it, that establishes that at the time of the referral, SH had

10   developmental deficits, as opposed to temporary developmental

11   delays common to premature infants.  Ms. Holt's reported concerns

12   and observations about SH's development do not establish that SH

13   had "learning deficits" or any of the other injuries plaintiffs

14   are suing over.

15       The government, quoting Exhibit D, asserts that the Holts

16   knew that SH had "'motor skills that were significantly delayed

17   when compared with other children of her own age,' even

18   correcting for S.H.'s prematurity," because this evaluation was

19   read aloud to them.[17]  ECF No. 147 at 10.[18]  However, nothing in

20   the evaluation states or implies that SH's significantly delayed

21   motor skills are, or will lead to, the catastrophic, life-long

22   

23   [17] The court notes the government's emphasis in this section of
     its brief to what the Holts knew and when they knew it.  As the
24   government itself argues, this issue goes to whether the statute
     of limitations should be tolled, which is not in issue here.  The
25   court will consider the government's arguments here to be
     asserting what conditions SH had, not simply what conditions her
26   parents knew about.

27   

28   [18] See also, Exh. D at US_001910 ("[a]ll testing took into
     consideration S.H.'s adjusted age for prematurity").

1  motor deficits that plaintiffs are suing over.  Rather, the cited

2  evaluation was done 7 months after SH was born, at a time when

3  her evaluation age – adjusted for her prematurity – was just 5

4  months.  See Exh. D at US_001905 ("Chronological Age: 7 months,"

5  "Adjusted Age: 5 months").  To the contrary, the cited

6  evaluation, while establishing that SH qualified for "Early

7  Intervention services" because of her "delays in the areas of

8  motor and problem-solving skills," never states that SH is

9  permanently or catastrophically injured in regard to her motor

10 skills.  Rather, it establishes that at the early stage SH was

11 evaluated, she was "at risk for developing motor problems

12 including cerebral palsy."  Id., at US_001910 (emphasis added).

13     The government next cites Exhibit X for the proposition that

14 the Holts knew that SH "required and received physical therapy,

15 speech therapy (for feeding), and occupational therapy, all while

16 in Spain," and that plaintiffs went to Germany to get a pediatric

17 neurological evaluation for SH.  ECF No. 147 at 10.  Aside from

18 the "occupational therapy," the government's assertion appears to

19 be correct.[19]  However, it does not establish that SH had any of

20 the injuries the plaintiffs are suing over now.  The government

21 has offered no evidence to show that a child who receives

22 physical and speech therapy at 13 months necessarily has cerebral

23 palsy, or some other catastrophic and permanent injury.  The

24 government is also correct that the evidence shows that

25 _____

26 [19] As for "occupational therapy," Exh. D indicates that there was
   an "evaluation/assessment," but it offers no explanation of what
   that could mean for such a young child.  In any event, it does
27 not state that SH, then a 13-month old child, "received"
   occupational therapy.  See Exh. D at US_002060 ¶ 13.

28
                              26

1  plaintiffs went for a pediatric neurologic exam in Germany while

2  they were still living in Spain.  However, going for an exam is

3  not itself evidence of the permanent and catastrophic injuries

4  that plaintiffs are suing over now.  As discussed above, the

5  evidence does show that SH was "at risk" for such injuries, but

6  at this point, while plaintiffs were still living in Spain, the

7  evidence thus far does not tend to show that those injuries had

8  yet occurred.

9       The government next cites Dr. Delgado for the proposition

10 that plaintiffs "returned to the U.S. some two years early due to

11 S.H.'s manifesting problems, for which S.H. would need

12 specialized care not available to her in Spain."  ECF No. 147

13 at 10, citing TR 622:5-19.  The cited testimony, by Dr. Delgado,

14 was that:

15          Over the course of my interactions with the
            family and with the other pediatric
16          specialists on the base, the conclusion was
            that Sarah would eventually need services
17          that we couldn't offer there. And so we had
            to take active measures to provide the family
18          with paperwork that they would submit that
            would trigger an early return.
19

20 TR 622:13-18.  This testimony is consistent with the evidence,

21 discussed above, that SH's parents and doctors were concerned

22 that she was "at risk" for serious injuries, including cerebral

23 palsy, and that there was a possibility that other serious

24 injuries could eventually develop.  The evidence, including Dr.

25 Delgado's account, thus leads to the reasonable inference that

26 the parents decided to transfer to a place that would be prepared

27 to deal with these eventualities if they did occur.  There is no

28

1    reasonable inference from this evidence that those injuries had

2    already occurred at the time the parents decided to leave Spain.

3        The government next asserts that plaintiffs' own evidence

4    shows that SH received a "brain injury" at birth, and in any

5    event no later than one year after birth, and therefore the

6    injury occurred in Spain.  ECF No. 147 at 11.  The government is

7    correct that the uncontested evidence allows the court to

8    conclude that SH received a brain injury at birth, and that this

9    was the injury that resulted in her cerebral palsy.  <u>See</u> TR 69-70

10   (Dr. Null testimony: SH's cerebral palsy resulted from an injury

11   or insult to her brain that probably occurred at birth, or within

12   six months of birth).  Indeed, it is undisputed that "Plaintiff

13   SH's premature birth is the cause of her cerebral palsy."  Facts

14   ¶ 121.

15       The government's argument that this requires application of

16   the foreign claim exception is predicated however, on its

17   misrepresentation of the holding of the principal Supreme Court

18   case governing this issue, <u>Sosa</u>.  According to the government,

19   the Supreme Court "explained" in <u>Sosa</u> that "a claim arises in

20   'the jurisdiction in which injury was <u>received</u>.  <u>Sosa</u>, 542 U.S.

21   at 705 (emphasis added).'"  ECF No. 147 at 11.  However, the

22   Supreme Court "explained" no such thing.  Rather, in reaching its

23   actual holding, the Court surveyed what other courts, academics

24   and treatises had to say, and in the course of so doing, quoted a

25   1962 article published in the Florida Law Review:

26           A commentator noted in 1962 that, for the
             purposes of these borrowing statutes, "[t]he
27           courts unanimously hold that a cause of
             action sounding in tort arises in the
28           jurisdiction where the last act necessary to

                                 28

1   establish liability occurred”; i.e., “<u>the
    jurisdiction in which injury was received.</u>”
2   Ester, “Borrowing Statutes of Limitation and
    Conflict of Laws,” 15 U. Fla. L. Rev. 33, 47.

3

4   <u>Sosa</u>, 542 U.S. at 705 (emphasis added).  The government’s

5   assertion that the court must look to where the injury was

6   “received,” is supported only by the author of the quoted law

7   review article, not by the Supreme Court in <u>Sosa</u>.

8        Moreover, the Supreme Court in <u>Sosa</u> did not simply adopt the

9   law review’s language.  Rather, the Court continued its survey of

10  other ways to describe where the claim arose, referring to the

11  following: “where [the] cause of action <u>arose, or accrued, or</u>

12  <u>originated</u>,” “courts generally applied the law of the place <u>where</u>

13  <u>the injury occurred</u>,” “[the conflicts of laws rule] is to apply

14  the law of <u>the place of injury</u> to the substantive rights of the

15  parties,” “defendant's liability determined by ‘the law of the

16  place of wrong,’” and “‘the place <u>where the harmful force takes</u>

17  <u>effect</u> upon the body.’”  <u>Sosa</u>, 542 U.S. at 705-06 (some emphases

18  added) (quoting <u>Richards</u>, 542 U.S. at 11-12, American Law Reports

19  and the Restatement (First) of Conflict of Laws).

20       By focusing on where the injury is “received,” the

21  government essentially excludes plaintiff’s theory that the court

22  should look to where the injury first “manifested” itself.  That

23  is because the place where the injury was “received” is also “the

24  jurisdiction where the last act necessary to establish liability

25  occurred,” according to the law review article, namely, the

26  premature birth.

27       Ultimately, <u>Sosa</u> held that “the FTCA's foreign country

28  exception bars all claims based on <u>any injury suffered</u> in a

29

1  foreign country."  The question then, is whether the injury

2  plaintiffs are suing over was "suffered" in Spain or in the

3  United States.  The government has failed to show that they were

4  suffered in Spain, because the brain injury the government refers

5  to is not the injury plaintiffs are suing over.  As discussed

6  above, the premature birth and resulting brain injury would not

7  necessarily lead to the cerebral palsy and catastrophic

8  neurological injuries plaintiffs are suing over.  The uncontested

9  evidence is that those events may be the cause of the eye issue,

10  and early developmental delay, neither of which plaintiffs are

11  suing over.

12      The question of where SH suffered the injury plaintiffs are

13  suing over is determined by federal law, as the government

14  asserts, because it goes to the applicability of an FTCA

15  exception.  The problem is that neither side has directed the

16  court to any case describing where the injury is suffered for

17  purposes of the foreign claim exception, other than Sosa.  While

18  Sosa provides the guiding principle involved here – the claim

19  arises where the injury is suffered – it does not tell us where

20  the injury was suffered in this case.  In Sosa, the injury

21  plaintiff was suing over – false arrest – plainly occurred in

22  Mexico.  See Sosa, 542 U.S. at 698 (Sosa sued under the FTCA

23  "alleging false arrest," and plaintiff's arrest "was said to be

24  'false,' and thus tortious, only because, and only to the extent

25  that, it took place and endured in Mexico").[20]

26  _____

[20] The location of the injury was not at issue in Sosa, since the

27  false arrest (or kidnapping) took place in Mexico, and that false
    arrest was what the plaintiff was suing over.  The issue in Sosa

28  was whether the location of the negligent or wrongful act

1    Accordingly, this court, following the Supreme Court's lead

2    in Sosa, looks to cases addressing statutes of limitations to

3    determine when and where the injury occurred. "[I]t is 'the

4    standard rule that [accrual occurs] when the plaintiff has 'a

5    complete and present cause of action.'" Wallace v. Kato, 549

6    U.S. 384, 388 (2007).

7            "Under the traditional rule of accrual ...
             the tort cause of action accrues, and the
8            statute of limitations commences to run, when
             the wrongful act or omission results in
9            damages. The cause of action accrues even
             though the full extent of the injury is not
10           then known or predictable." 1 C. Corman,
             Limitation of Actions § 7.4.1, pp. 526–527
11           (1991) (footnote omitted).

12   Wallace, 549 U.S. at 391.[21]  Although the applicability of the

13   foreign claim exception is determined by federal law, one aspect

14   of it is dependent upon the law of the place where the negligence

15   occurred, namely California. Specifically, in asking where the

16   "injury" happened, we must look to the law of California to

17   determine what is an injury. That is because the law of

18   California governs liability and therefore determines where the

19   injury sued on occurred in the first place. See 28 U.S.C.

20   § 1346(b).

21       Under California law, "injury" is defined "as the point at

22   which appreciable harm [from the negligence] was first

23   _____

24   governed where the claim "arose" for purposes of the foreign
     claim exception. The Court held that the claim "arose" not where
25   the negligence occurred, but where the injury occurred.

26   [21] "Were it otherwise, the statute would begin to run only after a
     plaintiff became satisfied that he had been harmed enough,
27   placing the supposed statute of repose in the sole hands of the
     party seeking relief." Wallace, 549 U.S. at 391.

28

                                    31

1   manifested.  To be 'manifested,' the damage from the negligence
2   must ha[ve] made itself known in some outward fashion." <u>Katz v.</u>
3   <u>Children's Hosp. of Orange County</u>, 28 F.3d 1520, 1526 (9th
4   Cir. 1994) (citations and some internal quotation marks omitted).
5   Accordingly, applying federal law, we know that the foreign
6   exception applies where the "injury" occurred.  But, applying
7   California law, we know that the "injury" occurs where it first
8   "manifests" itself.

9        The government argues that the injuries sued over were
10   manifest in Spain, citing "seizures," white matter brain damage,
11   "severe" developmental delay, and esotropia.  However, as
12   discussed above, the government has not shown the presence in
13   Spain of the catastrophic neurological damage or cerebral palsy
14   that plaintiffs are suing over.  The government has not shown the
15   existence of "seizures."  Rather, it has shown only that Ms. Holt
16   reported leg shaking, which plaintiffs are not suing over.
17   Although SH was prescribed phenobarbital, which can control
18   seizures, it was apparently prescribed as a preventive, and in
19   any event, SH was "weaned" from it while still in Spain.  The
20   developmental delay noted in the infant in Spain is not described
21   anywhere as the "severe" developmental delay that occurred in the
22   United States.  As noted above, plaintiffs are not suing over her
23   esotropia, a condition her father lives with and does not seem to
24   consider to be an injury to be sued over.  Plaintiffs are suing
25   over catastrophic neurological damage and cerebral palsy, which
26   the government has not shown existed in SH while she was in
27   Spain.

28        The government next asserts that Dr. Shales "told" the

1   Holts, while they were still in Spain, that SH had cerebral

2   palsy.  See TR 793.  The government is correct, and indeed, this

3   evidence is uncontested.  However, the evidence is not

4   particularly probative of anything.  Dr. Shales was the

5   "developmental pediatrician" at Rota who examined and treated SH

6   in Spain.  TR 772-73.  He was not a pediatric neurologist.

7   TR 800.  Indeed, there is nothing in the evidence adduced at

8   trial that would allow this court to conclude that Dr. Shales was

9   qualified to make such a diagnosis.  The court cannot simply

10  infer from his status as doctor, or as a developmental

11  pediatrician, that he was qualified to make a proper evaluation

12  of SH's neurologic system development, or to diagnose cerebral

13  palsy.  See TR 45 (Dr. Null expert testimony, cerebral palsy "has

14  to do with the development of their neurologic system"); TR 296

15  (Dr. Griesemer expert testimony, pediatric neurology deals with

16  cerebral palsy, among other brain, spinal cord, muscle and nerve

17  issues).

18       In addition, although Dr. Shales told the Holts that Sarah

19  had cerebral palsy, there is no evidence in the record to explain

20  why he told them that.[22]  Thus, the evidence does not show whether

21  this statement reflects his own diagnosis (even if he were

22

23  [22] This deficiency arose because the government failed to comply
    with the rules that would have permitted him to testify as an
24  expert, or to at least give expert testimony as a treating
    physician.  See Fed. R. Civ. P. 26(a)(2)(C).  Accordingly,
25  Dr. Shales was able to testify only about communications he had
    with plaintiffs, and was precluded from testify about any
26  underlying reasons, which would have required him to give expert
    testimony.  See Republic of Ecuador v. Mackay, 742 F.3d 860, 865
27  n.1 (9th Cir. 2014).

28

1    qualified to make it), or he was simply repeating what someone

2    else told him, or whether he was telling them something he had

3    read in a medical chart.  Finally, even if Dr. Shales had been

4    qualified to make this diagnosis, far more convincing evidence in

5    the record shows that Dr. Shales's statement was incorrect, and

6    that SH did not, in fact, have cerebral palsy at the time Dr.

7    Shales said she did.

8        Dr. David Griesemer is a board certified doctor in pediatric

9    neurology, is in charge of the pediatric neurology departments at

10   two hospitals in North Carolina, treated SH in South Carolina,

11   examined all the medical records relating to SH, and testified as

12   an expert in this case.  RT 294-95, 296-97.  Dr. Griesemer

13   discussed in some detail the examination that Dr. Shales had

14   made, and concluded that "there was nothing on his exam that

15   provided any evidence of cerebral palsy."  RT 324-25.  To the

16   contrary, the medical records show that upon birth, SH "was doing

17   well."  RT 309.  There was no evidence of "hypoxic ischemic

18   injury or anoxic brain injury."  RT 309.  Moreover, looking at

19   all the records that Dr. Shales had available to him, Dr.

20   Griesemer concluded that "there is nothing in the medical record

21   that allows him to draw that conclusion [that SH had cerebral

22   palsy]."  RT 329.

23       It appears that at least some of what Dr. Shales told the

24   Holts came from an examination by Dr. Smith, a pediatric

25   neurologist.  However, Dr. Smith's report did not state that SH

26   had cerebral palsy:

27               Q. BY MS. E. STEFFIN: Now, you had described
                Dr. Smith's examination of Sarah, and that
28              was, again, Exhibit 2T, Defendant's Exhibit

1    2T, that we already looked at.  What you're
     telling me then is it doesn't appear that
2    there is a new exam here?

3    A. No.  I think his [Dr. Shales's] current
     diagnosis, number one, basically parrots what
4    Dr. Smith observed in her examination, you
     know, at six-and-a-half -- I'm sorry -- at 9
5    months of age.  So, I mean, the words are
     exactly the same as in Dr. Smith's note.
6
     Q. Except in Dr. Smith's note, did she make
7    that diagnosis?

8    A. No, I'm sorry. The words hypotonia in the
     trunk and dynamic hypertonia in all
9    extremities is taken directly from her note.
     The diagnosis of cerebral palsy was not in
10   her note.

11   TR 328-29.  Indeed, one of the "hallmark" or "cardinal" findings

12   needed to establish the existence of cerebral palsy is "increased

13   tone."  TR 318.  However, "that cardinal finding of cerebral

14   palsy on Dr. Smith's examination was absent."  TR 318.  Other

15   hallmarks of cerebral palsy – such as leg scissoring, adductor

16   tightness, pathologically increased reflexes – were not present

17   in Dr. Smith's report.  RT 319-20.

18   As to the MRI that was taken in Spain, that also did not

19   show the presence of cerebral palsy:

20   THE COURT: Can I go back, Doctor.  About to
     demonstrate how much I know.  Given the
21   finding, is that in your mind – do you have
     an opinion as to whether that is significant
22   evidence of some sort of problem that the
     child is going to have or presently has?
23
     THE WITNESS: No.  I think everyone was very
24   cautious not to equate this finding with
     something that would be necessarily
25   problematic later.  I think the best we get
     out of anyone, whether it's the radiologist
26   or the neurologist, is this is something that
     needs to be followed up, we need to look at
27   it later.  It is clearly not a clear
     prediction of her later diagnosis of cerebral
28   palsy.

1    TR 316-17.

2         Indeed, it is undisputed that cerebral palsy is a grouping

3    of non-progressive, non-contagious motor conditions that cause

4    physical disability in human development.  Facts ¶ 117.  Put

5    another way, in general "cerebral palsy actually describes

6    symptoms caused by some brain insult or injury."  TR 66 (Dr. Null

7    expert testimony) (emphasis added).  Accordingly, this is not

8    like a disease that might exist in the body but not be

9    discovered, through outward symptoms, until some time later.  In

10   this case, the outward symptoms are the condition of cerebral

11   palsy, so if they are not observable, or manifest, then the

12   condition is not there:

13            THE COURT: … If a child is not -- in Sarah's
             case   --   is  not   exhibiting  the  classic
14           symptoms of CP, is it fair to say - I know
             that  defense  counsel  will  ask  this  more
15           carefully than I can -- is it fair to say she
             doesn't have it, CP is not yet present, or
16           it's simply disguised in some way? Is that a
             good question?
17
             THE WITNESS [Dr. Griesemer]: Well, it's not
18           disguised, but it's not manifest.

19           THE COURT: Okay.  I understand now.

20           THE WITNESS: You know, when we talk about
             making a diagnosis of CP, it's got to be
21           something that we can ascertain, that we can
             see, and it's got to be something that's a
22           problem.

23           THE COURT: I got you.

24           THE WITNESS: And at this point it was
             neither.  We couldn't see it, and it really
25           wasn't a problem, and so everyone said, well,
             let's just keep her on our watch list.
26

27   TR 322.

28
                              36

1    The evidence shows that SH's cerebral palsy did not manifest

2    itself until she was in South Carolina:

> THE COURT: When was she first diagnosed with
> CP, Doctor, if you can tell me?
>
> THE WITNESS: Neither of the pediatric
> neurologists in South Carolina, neither Dr.
> Barbosa nor Dr. Livingston, used the term
> cerebral palsy, but both of them suspected
> that she had spastic diplegia, and so that
> would be a type of cerebral palsy.
>
> THE COURT: And that would be roughly at what
> age?
>
> THE WITNESS: That would be at 16 to 17 months
> of age, which is about right. You know, it's
> creeping up on that 18-month period where a
> diagnosis is makeable.

12   TR 330-31 (Griesemer).  Thus, the government's distinction

13   between when a disease exists and when it is diagnosed is not so

14   easily applicable to cerebral palsy, which is not a disease, but

15   a group of symptoms or manifestations.  The uncontested expert

16   evidence of Dr. Griesemer shows that if those symptoms are not

17   manifest, then the condition does not exist.  In this case, there

18   were symptoms that were consistent with premature birth, and with

19   conditions that a premature child could grow out of.  It was not

20   until plaintiffs arrived in South Carolina that symptoms appeared

21   that doctors could identify as cerebral palsey.

22   The government next asserts that SH had "white matter brain

23   damage" while in Spain.  (ECF No. 174 at 14.)  The question

24   however, is whether there was any manifestation of that damage

25   while plaintiffs were in Spain.  The government identifies no

26   evidence establishing that the issues the plaintiffs dealt with

27   in Spain – leg shaking, developmental delay at 7 months and

28   esotropia – are manifestations of "white matter brain damage,"

1  rather than ordinary, temporary manifestations of premature

2  birth.

3        **D.   Conclusion – Jurisdiction.**

4        The court accordingly concludes that the government has not

5  met its burden to show that the injuries plaintiffs are suing

6  over occurred in Spain.  To the contrary, the evidence shows that

7  SH's cerebral palsy occurred in South Carolina.  The government's

8  motion to dismiss this case on the basis of the foreign claim

9  exception will therefore be denied.

10                      **II.   THE MERITS**

11        Plaintiffs are suing the United States for "medical

12  malpractice" under the FTCA, the government's waiver of sovereign

13  immunity for such claims.  Under the FTCA, the government is

14  liable "in the same manner and to the same extent as a private

15  individual under like circumstances."  28 U.S.C. § 2674.

16  Liability is determined "in accordance with the law of the place

17  where the [negligent] act or omission occurred."  28 U.S.C.

18  § 1346(b).  In this case, plaintiffs assert that the negligent

19  acts and omissions occurred in the United States, namely,

20  Dr. Stahlman's approval, at Edwards Air Force Base, of the Holts'

21  application for overseas screening, without determining whether

22  it was appropriate to give this approval given her then-current

23  pregnancy, and her three prior problematic pregnancies.

24        Under California law, the elements of a claim for medical

25  malpractice are

26              "(1) the duty of the professional to use such
                skill, prudence, and diligence as other
27              members of his profession commonly possess
                and exercise; (2) a breach of that duty;
28              (3) a proximate causal connection between the

negligent conduct and the resulting injury;
and (4) actual loss or damage resulting from
the professional's negligence."

Gami v. Mullikin Medical Center, 18 Cal. App. 4th 870, 877 (2nd

Dist. 1993) (quoting Budd v. Nixen, 6 Cal. 3d 195, 200 (1971)).

### A.   Duty

The government argues that plaintiffs cannot establish the

first element of their claim because Ms. Holt was not a patient

of Dr. Stahlman, and therefore he did not owe her any duty.  The

government is correct that an "essential element" of plaintiffs'

lawsuit is "the establishment of a duty owed to [Ms. Holt] by the

physician."   Keene v. Wiggins, 69 Cal. App. 3d 308, 312 (4th

Dist. 1977).   The government next argues that the only way to

establish this duty in a medical malpractice case is through the

physician-patient privilege, citing Keene.[23]   Keene expressly does

not stand for this proposition when it comes to California law:

> It is well established by authorities in
> other states the physician is liable for
> malpractice or negligence only where there is
> a relationship of physician-patient as a
> result of a contract, express or implied.

Keene, 69 Cal. App. at 313 (emphasis added).  Keene goes on to

state:

> In California, however, the courts have not
> used status alone as a means of determining
> liability.

---

[23] The government also asserts that plaintiffs "conceded" the
point in their Trial Brief.  ECF No. 174 at 15.  The parties
certainly can concede or stipulate to factual matters, and the
court will generally respect such a concession.  The same is not
true for concessions on the state of the law.  The court always
hopes that the parties' trial briefs and post-trial briefs will
be helpful, but it is the court's job to rule on what the law is,
not the parties.

1   <u>Keene</u>, 69 Cal. App. 3rd at 313.   Rather, under California law:

2           The fundamental principle is all persons are
            required to use ordinary care to prevent
3           others being injured as a result of their
            conduct and any departure from this principle
4           involves the balancing of a number of
            considerations, namely:
5
            (a) the foreseeability of harm to the
6           plaintiff;
7
            (b) the degree of certainty the plaintiff
            suffered injury;
8
            (c) the closeness of the connection between
9           the defendant's conduct and the injury
            suffered;
10
            (d) the moral blame attached to the
11          defendant's conduct;
12          (e) the policy of preventing future harm;
13          (f) the extent of the burden to the defendant
            and consequences to the community of imposing
14          a duty to exercise care with resulting
            liability for breach; and
15
            (g) the availability, cost, and prevalence of
16          insurance for the risk involved.

17  <u>Keene</u>, 69 Cal. App. 3d at 312 (citing <u>Rowland v. Christian</u>, 69

18  Cal. 2d 108, 112 (1968)).   A final factor to be considered is

19  "the extent to which the transaction was intended to affect the

20  plaintiff."   <u>Keene</u>, 69 Cal. App. 3d at 312 (citing <u>Biakanja v.</u>

21  <u>Irving</u>, 49 Cal. 2d 647, 650 (1958)).

22       In <u>Keene</u>, the employer hired the doctor "solely to conduct

23  an examination [of the plaintiff] for purposes of rating

24  disability compensation benefits."   <u>Keene</u>, 69 Cal. App. 3d

25  at 314.   The court expressly recognized that "[t]he person under

26  examination is seeking benefits from the employer's carrier and

27  is pursuing a claim <u>adverse to the interests of the employer</u>."

28  <u>Id.</u> (emphasis added).   In applying the <u>Rowland</u> and <u>Biakanja</u>

40

1    factors to the case before it, the Keene court found that the

2    doctor did not "seek[] to provide a benefit" to the plaintiff, it

3    was "not foreseeable a claimant in a workers' compensation case

4    would, without question, accept and rely upon medical reports of

5    the employer's insurance carrier." Id.  Moreover, the

6    examination "was solely for the carrier's benefit in the

7    adversary workers' compensation proceedings," and there was no

8    evidence that the doctor "voluntarily offered Keene any advice

9    and counsel or otherwise intended to benefit Keene personally."

10   Id., at 316.  Accordingly, the court concluded that the doctor

11   owed the plaintiff "no duty of professional skill in connection

12   with the report" the doctor prepared for the plaintiff's

13   employer.  Keene, 69 Cal. App. 3d at 316.

14       This case is fundamentally different from Keene.  According

15   to the evidence adduced at trial, when an Air Force service-

16   member is preparing to be transferred overseas, and he has

17   dependents whom he would like to accompany him at government

18   expense, the Air Force conducts an "overseas screening."[24]

19   TR 497-98 (Copeland testimony).  This screening was conducted by

20   (1) a special needs coordinator, who had to have a degree in

21   social work, or be a registered nurse, or the like, but was not

22   an "administrative person," and (2) a "medical review officer,"

23   who had to be a physician or a physician's assistant under the

24   supervision of a physician.  TR 500:7-16.

25       The purpose of this screening was to "identify if there were

26   _____

27   [24] This assumes that the transferee location is one where
     dependents in general can go, that is, excluding places like
     Afghanistan.  TR 498:12-16.

28

                                    41

any obvious contraindications to sending the family together as a unit." TR 501. Specifically, it was to identify whether the dependent has any special needs, and whether those needs can be met at the receiving location. TR 501-02. If a special need was identified, that would trigger two things. First, it would trigger a "Facilities Determination Inquiry." TR 502 & 503. Second, it would trigger an inquiry into whether the service member is already enrolled in the Exceptional Family Member Program, and if not, an evaluation for enrollment in that program would commence. See TR 503.

The overall purpose of this process, unsurprisingly, is "ultimately because of the military mission." TR 510. That is, if a service-member has dependents with special needs that are not being met at the overseas location, that will distract the service-member, and might even require the return of the family from the overseas location, all to the detriment of the military mission. RT 509 & 510. However, the means of ensuring that the military mission is not compromised in these situations, is to protect the "family member's well-being" while the service-member and the family are overseas. TR 509.

Viewing all this in the context of the Rowland factors, this court finds that Dr. Stahlman owed a duty to Ms. Holt to conduct the screening with the due care expected of a physician. The harm to Ms. Holt was foreseeable, indeed avoiding such harm was the reason the screening was done in the first place – to avoid foreseeable harm to military depends going to live overseas. The very existence of this screening program is an acknowledgment that some Air Force bases are not medically appropriate for some

42

1  dependents, and that sending them there would harm them, thereby

2  harming the military mission.

3      Further, it is undisputed here that the plaintiff suffered

4  an injury, and as discussed below, the evidence shows that it was

5  proximately caused by Dr. Stahlman's conduct.  The court finds

6  that the policy of preventing future harm would be well served by

7  ensuring that the medical screening process is not simply a

8  "rubber-stamping" of the service-member's request to bring his

9  family with him overseas.  Moreover, the court is aware of no

10  additional burden to the community by requiring that the doctor

11  exercise due care in conducting the screening.

12      Finally, the court finds that the screening process was

13  intended to benefit Ms. Holt.  It is true that the ultimate goal

14  of the screening was to benefit the Air Force, but that ultimate

15  goal was to be achieved by ensuring the well-being of the

16  service-member's family.  Thus, in stark contrast to the Keene

17  case, the physician here was not conducting a screening during an

18  adversary proceeding with plaintiffs.

19      The government's citation to Mero v. Sadoff, 31 Cal.

20  App. 4th 1466, 1471 (2d Dist. 1995), is equally unavailing.  That

21  case held that a doctor was liable to a plaintiff for medical

22  malpractice, despite the absence of a physician-patient

23  relationship, where the doctor injured the patient during the

24  course of a physical examination.  The case confirms the

25  principle that the existence of a physician-patient relationship

26  is not, in every case, required to find medical malpractice.

27      Felton v. Schaeffer, 229 Cal. App. 3d 229, 234-35 (4th

28  Dist. 1991), also relied upon by the government, does not compel

1   a different result.  Despite its broad language, <u>Felton</u> involved

2   a physical examination that resulted in <u>economic</u> harm when the

3   doctor negligently examined the plaintiff in the context of a

4   pre-employment examination.  In <u>Felton</u>, the doctor's negligence

5   resulted in plaintiff not getting a job.  Here, the alleged harm

6   was medical, precisely the type of harm sought to be avoided by

7   the medical screening.

8        The court concludes that Dr. Stahlman had a duty to screen

9   Ms. Holt with the due care expected of a physician.

10      **B.    Breach.**

11           **1.    Undisputed Facts.**

12                a. In or about 1998, Plaintiff Chantal Holt gave

13  birth to her first child ("MH") while her husband was stationed

14  at Travis Air Force Base, in Solano County, California.  Facts

15  ¶ 15.

16                b. Plaintiff Chantal Holt experienced preterm

17  contractions and preterm labor with her first child.  Facts ¶ 16.

18                c. Plaintiff Chantal Holt's first child was born

19  at approximately 32 weeks.  Facts ¶ 17.

20                d. In or about 2000, Plaintiff Chantal Holt gave

21  birth to her second child ("LH") while her husband was stationed

22  at a military installation in Germany.  Facts ¶ 18.

23                e. Plaintiff Chantal Holt's second child was born

24  at Landstuhl Medical Center, Germany.  Facts ¶ 19.

25                f. Plaintiff Chantal Holt experienced preterm

26  contractions and preterm labor with the second child.  Facts

27  ¶ 20.

28                g. Plaintiff Chantal Holt received care from

                              44

Dr. Hildebrand, a specialist at Landstuhl Medical Center, while
pregnant with her second child.  Facts ¶ 21.

        h. Plaintiff Chantal Holt's second child was born
at approximately 34 weeks.  Facts ¶ 22.

        i. Plaintiff Chantal Holt's second child spent
several days in the neonatal intensive care unit immediately
after birth.  Facts ¶ 23.

        j. Plaintiff Chantal Holt's second child exhibited
difficulties associated with prematurity, including difficulty
breathing and eating, but suffered no long-term effects from the
premature birth.  Facts ¶ 24.

        k. Prematurity is considered to be birth earlier
than 37 weeks.  Facts ¶ 26.

        l. Having a history of premature births puts any
subsequent pregnancy at a higher risk of premature birth.  Facts
¶ 27.

        m. Children born prematurely are at higher risk
for neurological and other medical conditions, including cerebral
palsy.  Facts ¶ 28.

        n. Plaintiff SH is the third child of Plaintiffs
Ken and Chantal Holt.  Facts ¶ 29.

        o. On or before October 15, 2004, Plaintiff Ken
Holt received notice that he would be transferred to the USAF Air
Mobility Squadron at Rota Naval Station, in or around Cadiz,
Spain.  Facts ¶ 36.

        p. In or about October 31, 2004, Chantal Holt
contacted Nurse Practitioner Spikowski ("NP Spikowski") at
Edwards AFB and told NP Spikowski that she had tested positive

1   for pregnancy.  Facts ¶ 37.

2              q. NP Spikowski advised Plaintiff Chantal Holt to

3   stop taking certain medications at that time, and referred her

4   for a pregnancy test.  Facts ¶ 38.

5              r. Plaintiff Chantal Holt underwent a pregnancy

6   test at the Edwards APB medical clinic.  Facts ¶ 39.

7              s. The pregnancy test confirmed that Plaintiff

8   Chantal Holt was pregnant on or about November 2, 2004.  Facts

9   ¶ 40.

10             t. NP Spikowski told Plaintiff Chantal Holt on or

11  about November 2, 2004, that she should see Nurse Hobby to get a

12  prescription for prenatal vitamins and to schedule a new

13  pregnancy meeting.  Facts ¶ 41.

14             u. At the new pregnancy meeting, Plaintiff Chantal

15  Holt was given a list of civilian medical providers for her

16  pregnancy care.  Facts ¶ 42.

17             v. Plaintiff Chantal Holt chose Dr. Bansi Vora, a

18  civilian doctor, for her pregnancy-related medical care.  Facts

19  ¶ 43.

20             w. In or about November 2004, Edwards APB medical

21  staff gave plaintiff Chantal Holt a referral to Dr. Vora for her

22  pregnancy-related medical care.  Facts ¶ 44.

23             x. Dr. Vora is not an employee of the United

24  States.  Facts ¶ 45.

25        **2.   Findings of Fact**

26        **a.   Travis AFB and Landstuhl.**

27      The uncontested evidence shows that after Ms. Holt's first

28  pre-term delivery, the medical personnel at Travis did not "make

46

1   a really big deal about it." TR 85.  The child, MH, was placed

2   in the NICU for 12 hours for monitoring, and plaintiffs were then

3   sent home thinking they had had "the same experience everybody

4   else had."  TR 85.

5        The uncontested evidence also shows that prior to Ms. Holt's

6   second preterm delivery, she was hospitalized twice at Landstuhl,

7   and given IV drugs to prevent her preterm contractions.

8   RT 87-88.  After the premature birth of LH, the child was placed

9   in the NICU for "[b]etween three and four" weeks.  RT 89.

10  Although this was Ms. Holt's second premature birth, the medical

11  personnel at Landstuhl, including Dr. Hildebrand, did not give

12  Ms. Holt any information or warnings about future births.

13  TR 88-89; Facts ¶ 21.  Instead, they told Ms. Holt her two

14  premature births "don't appear to be related."  RT 89.

15       The evidence further shows that because of Ms. Holt's two

16  prior pre-term deliveries, "she was at very high risk to have a

17  subsequent preterm delivery.  And therefore, it was critical that

18  she be informed of that risk factor."  TR 33 (Dr. Null

19  testimony).[25]

20              **b.   Edwards AFB.**

21       In late summer 2001, Mr. & Ms. Holt, MH and LH moved to

22  Edwards Air Force Base in California.  RT 89.  During their time

23  there, and before Ms. Holt became pregnant with SH, Ms. Holt had

24  a miscarriage (sometimes referred to in the record as a

25  "spontaneous abortion").  RT 646 (video deposition of Mr. Holt

26

27  [25] The government objected to this testimony as outside the scope
    of his expert report, but the objection was overruled.  TR 33-35.

28

47

1   read at trial).

2        In October 2004, Mr. Holt was notified that he would be

3   transferred to Spain for at least three years.  TR 389-90.

4   Mr. Holt accordingly completed a "RIP" form on which he listed

5   his wife and two children, whom he wanted to accompany him on his

6   overseas assignment.[26]  RT 390-92 (Mr. Holt testimony); 499-500

7   (Copeland testimony).  Mr. Holt and his family were thereupon

8   scheduled for an overseas screening session.  RT 93 (Ms. Holt

9   testimony).

10       Ms. Holt's pregnancy with SH was confirmed by Air Force

11   medical personnel, on or about November 2, 2004.[27]  The overseas

12   screening session took place a few days later, on November 5,

13   2014.  See TR 465-66 (Stahlman testimony); Tr. Exh. 48 (clearance

14   for travel form).  It was conducted by Dr. Stahlman and by Major

15   Clark (now deceased).  RT 465.

16       The purpose of the screening was to determine whether the

17   dependents "had any medical problems that the gaining base would

18   be unable to take care of."  TR 450 (Stahlman testimony).  In

19   order to carry out this function, the doctor (and coordinator)

20   spoke with the dependents and reviewed their medical records.

21   TR 450.  If during this process, the doctor identified any

22   _____

23   [26] No witness could say what the acronym "RIP" stood for.
     However, Mr. Holt believes it starts with "Record of Individual
24   …."  TR 390.  It appears to be "a … notification that you're
     being looked at for a specific assignment."  TR 498 (Copeland
25   testimony).

26   [27] The undisputed facts and the testimony are unclear about
     whether November 2nd was the date of the pregnancy test, with the
27   results coming later, or whether it was the date that the results
     were known.

28

1   medical concerns, or anything he wasn't sure might be a medical
2   concern, he would investigate further and "review the medical
3   record more in depth." TR 451-52.[28]

4         One of the issues the doctor would look at, if he knew the
5   patient was pregnant, was whether she "had any significant
6   medical or OB problems." RT 453, 459 (would only investigate
7   further if he knew the patient was pregnant). If there remains
8   an issue as to whether the receiving base could handle a medical
9   issue relevant to a dependent, then the doctor would request to
10  have that information sent "to the gaining base so that they can
11  review it." TR 453. That "review" would be to determine if the
12  receiving base could handle the medical issue. TR 42 (Null
13  testimony). One such medical issue that would cause the doctor
14  to get further information about the dependent is if he learned
15  that the dependent had had two previous premature births and a
16  prior miscarriage:

17              THE COURT: Right. But in your screening
                position, if you learned -- actually, either
18              from the records or from the conversation
                with the dependent that she had had previous
19              premature -- or two previous premature
                births, what would that tell you, if
20              anything, in terms of your job, I mean?

21              THE WITNESS: We're just talking in
                generalities, correct?
22
                THE COURT: Yes.
23
                THE WITNESS: Correct. You would have to get
24              further history of exactly what was going on

25  _____
    [28] The government now blames the late Major Clark for any
26  deficiencies in the overseas screening. See ECF No. 147 at 17 &
    n.8. Dr. Stahlman's own evidence shows, however, that he had a
27  role – to investigate further – and that he (not Major Clark)
    failed to investigate further.
28

49

1    with those pregnancies and exactly what kind
     of problems were going on, yes.
2
     THE COURT: So at minimum, what would happen
3    is if you learn that had there had been
     prematures, the next question you would have
4    tried to ascertain was what was the nature
     and what was the problem?
5
     THE WITNESS: Correct.
6

7    TR 454-55.

8        The uncontested evidence in this case is that at the time

9    Dr. Stahlman conducted the overseas screening for the Holt

10   family, Ms. Holt had already had two premature deliveries on U.S.

11   military bases under the care of U.S. military medical personnel,

12   as well as a miscarriage.  The evidence shows that all of this

13   information was documented in her medical records which were

14   provided to, and reviewed by Dr. Stahlman prior to, or at the

15   time of, the screening.  See RT 467 (information from patient

16   visits are placed directly into the patient's medical records).

17   However, Dr. Stahlman did not do what he himself said he was

18   required to do, and what Dr. Null said must be done under the

19   standard of care, namely, investigate further, and determine

20   whether the receiving base could handle a person with Ms. Holt's

21   OB history.  This conduct plainly did not meet the standard of

22   care.

23       The government resists this conclusion by asserting that

24   "there is no evidence that Col. Stahlman knew that Mrs. Holt was

25   pregnant."  ECF No. 147 at 17.  The assertion is simply false,

26   because there is evidence that Dr. Stahlman knew that Ms. Holt

27   was pregnant.  Even if the government believes the evidence is

28   insufficient or should not be believed, it is simply false to

1  assert that there is "no evidence" of it.

2       The evidence is uncontested that Ms. Holt's pregnancy test

3  was done by Air Force medical personnel at Edwards Air Force

4  Base.  It is uncontested that this test result was entered into

5  Ms. Holt's medical records kept by the Air Force.  It is

6  uncontested that Ms. Holt's medical records were provided to

7  Dr. Stahlman, for his review, prior to the screening.

8       The government nevertheless asserts that Dr. Stahlman did

9  not have access to the laboratory records showing Ms. Holt's

10  pregnancy until after November 5th.  ECF No. 174 at 17.  That may

11  be, but what happened to the official, paper laboratory results

12  is not determinative of what Dr. Stahlman knew, or when he knew

13  it.  Even assuming that Dr. Stahlman did not see the records from

14  the laboratory prior to the screening, the undisputed facts of

15  this case establish that Carla Spikowski knew that plaintiff was

16  pregnant on or about November 2, 2004, and told Ms. Holt, on that

17  date, "that she should see Nurse Hobby to get a prescription for

18  prenatal vitamins and to schedule a new pregnancy meeting."

19  Facts ¶ 41.

20       In order for Dr. Stahlman to know nothing of Ms. Holt's

21  pregnancy, not only would the lab results need to still be in

22  transit and not yet in the official records, but Spikowski must

23  have failed to enter this obviously important medical development

24  into Ms. Holt's medical records.  Dr. Stahlman's own testimony

25  refutes this possibility.  He testified that when a person was

26  seen in a clinic, the medical personnel would enter the notes

27  from that visit into the medical records that day, even if the

28  results of a lab test would not be entered until days later:

51

1    Q. … Okay. And so do you know how often those
     records were updated, the paper charting that
2    was done?

3    A. Well, normally, they would be pulled when
     a patient was seen in the clinic, and those
4    notes from that visit would be put in the
     record.
5
     Q. Do you know if that would take
6    approximately 24 hours or more before a
     patient had been seen and the paper chart to
7    make it to that individual's records?

8    A. Well, normally, if you saw a patient in
     the clinic, the papers from that visit would
9    be put in the record that day.

10   THE COURT: Directly? You'd have the records
     there.   You would put whatever you're – I
11   don't mean you personally – the doctor would
     make whatever notes he made, and put it right
12   in the record?

13   THE WITNESS: That's correct.

14   Q. BY MS. BERG: Was there a more lengthy
     process for lab results before they would
15   make it into the actual paper records?

16   A. Right. So lab results would have to be
     sent from the lab to the central record area,
17   and they might not be filed for a day or two,
     or several days. If the record had been
18   pulled out of clinic for another visit, then
     it might take a little while for those two to
19   match up.

20   RT 467-78.  In other words, there is no reason to think that

21   Dr. Stahlman only knew information contained in an official,

22   paper laboratory report.  Rather, he would also know what was

23   entered into the medical record by Ms. Holt's other providers,

24   including Spikowski.  There is no basis for believing that

25   Spikowski would have withheld this information, and the

26   government does not assert that she did.

27       In any event, the evidence is contradictory on whether the

28   official, paper lab report would have made it into the records

                                    52

1   reviewed by Dr. Stahlman in time.   The government cites

2   Dr. Stahlman's testimony that lab results "might not be filed for

3   a day or two, or several days."   See TR 468 (Stahlman testimony).

4   But the government makes no reference to, nor does it attempt to

5   refute the testimony of, Spikowski, who does not suffer the

6   obvious bias that Dr. Stahlman does:

7           Question: And so if he – let me represent to
            you that he signed off on seeing her on
8           November 5th.   So is it fair to say that he
            would have had access to those medical
9           records demonstrating she was pregnant on
            November 2nd?
10
            Answer: That's a fair assumption.
11
    RT 429-30 (videotaped deposition testimony of Spikowski).
12
        In addition, the evidence shows that Dr. Stahlman was <u>told</u>
13
    in the screening room that Ms. Holt was pregnant, and that he
14
    discussed it with her.   Ms. Holt testified as follows:
15
            We got in there, and we sat down. [LH], as
16          soon as we sat down, announced that he was
            going to be a big brother, which opened the
17          conversation with the gentlemen.

18          They said that -- the niceties that you get
            when someone announces that. And I told them
19          that it was early on.

20   RT 94.   Thus, Ms. Holt's direct, eye-witness testimony is that

21   Dr. Stahlman was told of Ms. Holt's pregnancy, and discussed it

22   with her.

23       This testimony is uncontested.   Dr. Stahlman's testimony

24   plainly showed that he did not specifically recall meeting

25   Ms. Holt and her children for the screening.   See TR 458-65.   All

26   of Dr. Stahlman's testimony regarding that screening were derived

27   from the documents he was shown, and none of it came from his own

28   memory.   Finally, his testimony established that he did not

1    remember, one way or the other, whether he discussed Ms. Holt's

2    pregnancy with her:

3              Q.  Okay.  Do you have any recollection of
                whether or not you had a conversation with
4              Mrs. Holt about pregnancies? And if you don't
                recollect, that's fine. I'm just asking.
5
                A. I do not.
6

7    TR 465.

8         The government asserts that Dr. Stahlman "testified that he

9    did not know that Mrs. Holt was pregnant."  ECF No. 147.  That is

10   not a fair description of his testimony.  After testifying that

11   he did not recall having a conversation with Ms. Holt about her

12   pregnancy, Dr. Stahlman then testified "I do not believe" that he

13   saw the pregnancy lab reports, and "I do not believe that I knew

14   that the patient was pregnant."  TR 479 & 480.  However neither

15   of these statements even purports to come from his own memory.

16   They are based upon the fact that Dr. Stahlman did not make a

17   further investigation or request an FDI, and his belief that he

18   would have done so if he knew that Ms. Holt was pregnant.

19        The court finds that Dr. Stahlman knew that Ms. Holt was

20   pregnant, and that Ms. Holt had had two prior premature

21   deliveries and a miscarriage.  The court further finds that Dr.

22   Stahlman breached his professional duty of care to Ms. Holt by

23   failing to investigate further her OB history, and failing to

24   take any steps to ensure that her overseas travel would not

25   endanger her or SH.

26        **C.   Causation.**

27        Plaintiffs assert that the Air Force medical personnel's

28
                                   54

failure to warn Ms. Holt of the dangers inherent in future

pregnancies, and its decision to let her travel to Spain without

determining whether the facilities there were adequate to deal

with her pregnancy, was the proximate cause of SH's injuries.

They presented clear expert evidence to this effect:

> BY MR. BERMAN: Now, Doctor, assume that they didn't approve her, assuming that she didn't go to Spain, all right, do you have an opinion as to whether or not she would have still delivered prematurely? …
>
> MR. BRODERICK: Object. That's outside the scope.
>
> THE COURT: Overruled. You may answer.
>
> THE WITNESS: I think based on the two previous preterm deliveries where she did have early labor, or the appearance of early labor, and was managed appropriately by perinatal individuals, and didn't deliver extremely early, that I think there is very clear evidence that she would not have delivered at the gestational age she delivered at.
>
> …
>
> THE COURT: And that is, in your view, a delayed delivery would have avoided, would most likely have avoided the consequences that Sarah now suffers?
>
> MR. BRODERICK: And we'll respectfully object to the Court's question as outside the scope as well.
>
> THE COURT: I understand that, and unfortunately – well –
>
> THE WITNESS: The answer is, it absolutely would have avoided that, yes, sir.

TR 41-42 & 42-43 (Dr. Null expert testimony).

   The government asserts that there is no causation because

Ms. Holt received "appropriate" care in Spain.  However, while

there is no evidence that Ms. Holt was the victim of malpractice

in Spain, the evidence is clear that Ms. Holt did not receive care in Spain that was appropriate for her dangerous pregnancy. Appropriate care for a person in her condition would be prenatal care addressing the danger, ready access to a NICU and specialists who deal with premature deliveries.  See RT 64.  None of this was available at the base where Ms. Holt got her care in Spain.  Id.  The government's assertion that appropriate care was available at a base in a nearby country (Germany), and at a private hospital in Spain that was not required to accept Ms. Holt,[29] does not address the fact that Ms. Holt was sent for care to an inappropriate facility.[30]

While there is no evidence (or allegation) that the care Ms. Holt received in Spain was negligent in any way, the evidence does show that the facility where she was treated was not capable of handling the issues she faced.  It did not have a NICU and it did not have perinatal care available for Ms. Holt.  TR 64 (Ms. Holt testimony).  It had only one NICU nurse and none of the equipment that would be needed for a premature birth infant, such as proper-size intubation equipment or breathing tubes.  TR 102.  Overall, it was not equipped to prevent a premature birth or to handle a premature birth.  TR 658-59.

---

[29] According to Ms. Holt's testimony, it took three hours for Rota personnel to find a hospital capable of handling a premature birth, and willing to accept her.  RT 102.  Moreover, this was taking place on the day she had the emergency C-section.

[30] The same issue would arise if Ms. Holt had been sent to a facility that had only podiatrists available.  Those doctors could well have practiced their craft perfectly, but it is not the care that plaintiff needed.

1    As the direct result of these deficiencies, after Ms. Holt

2    was already in preterm labor, she had to be rushed, by ambulance,

3    to a facility capable of handling the situation.  TR 658-59.  Had

4    appropriate specialists and facilities been in place at Rota,

5    where Ms. Holt received her treatment, the traumatic, premature,

6    emergency C-section that Ms. Holt and SH endured would "more

7    likely than not" have been avoided.  TR 42.  Had that trauma been

8    avoided, it is likely that SH's subsequent injuries would not

9    have occurred, either.  TR 42-43.

10    The court finds that the government's negligence in clearing

11    Ms. Holt for travel to Rota, Spain, without making any effort to

12    determine if the facility was adequate for her needs, was the

13    proximate cause of the injuries that eventually befell SH.

14    **D.   Damages.**

15    **1.   Cost of care and lost earnings.**

16    Plaintiffs offered the expert testimony of Jenny McNulty, an

17    economic consultant, in support of its damages calculation.

18    RT 356.  She was subject to voir dire by the government, which

19    established that her opinions were "premised on the reports of

20    Dr. Barras and Dr. Ancell."  TR 359.  The government established

21    that McNulty would not give opinions "as a life-care planner,"

22    and that she would not give "opinions as to life expectancy" or

23    as to "vocational rehabilitation."  TR 359-60.  McNulty would

24    testify only "in an economic capacity."  RT 360.  After its voir

25    dire, the government announced that it was "fine with her

26    testimony."  TR 360.

27    McNulty accordingly calculated SH's "projected loss of

28    earnings."  TR 372.  She relied upon U.S. Census Bureau data, and

1   the Ancell expert report, assuming that without her injuries, SH

2   would have earned an Associate's or Bachelor's degree, and would

3   work for a typical number of years.  TR 373-74.  Her calculation

4   for lost earnings came to $620,945, using the Associate's degree

5   assumption, and $814,028, using the Bachelor's degree assumption.

6   TR 373-74.

7       McNulty next calculated the value of Ms. Holt's time spent

8   caring for SH.  TR 374-76.  She assumed that Ms. Holt cared for

9   SH 24 hours a day, every day from the day SH came home from the

10  NICU, excluding time SH spent in "the 4-K Head Start program,"

11  and excluding time SH spent in school.  TR 375.  McNulty used a

12  valuation for Ms. Holt's time of $30 per hour, which is based

13  upon the expert report of Dr. Barras.[31]  RT 375.  McNulty's

14  calculation of Ms. Holt's time came to $1,860,497 through June

15  2013, or $2,014,000 through March 2014.  TR 375-76.

16      McNulty next calculated the value of SH's future care

17  expenses.  RT 376-77.  This calculation is based upon the expert

18  report of Dr. Barras, which included costs for "surgeries to

19  medical needs, seeing doctors, to also equipment, wheelchairs, et

20  cetera, as well as nursing – the nursing attendant needs, and

21  then also educational needs."  RT 376-77.  McNulty's calculation

22  of these costs came to $7,023,383, if SH attended public school,

23

24  [31] The government asked McNulty how her calculations would be
    affected if the rate used were $18.50 per hour, instead of $30
25  per hour.  TR 378.  However, the government did not adduce
    evidence that the $18.50 rate was the correct rate to use.  The
26  only reference to that rate appears to be Ms. Holt's testimony
    that that rate would apply if she were to get "respite" care, but
27  which she says she is not entitled to.  TR 113.

28

1   and $7,384,072, if she went to private school.

2         The government did not challenge any of McNulty's testimony

3   during its opportunity to cross-examine her and it did not object

4   to her testimony after conducting a voir dire of her.  After

5   McNulty's testimony, the government moved to strike it, and in

6   its post-trial brief, the government asserts that McNulty's

7   testimony should be disregarded because the expert report of

8   Dr. Barras, upon which her testimony was based, was not admitted

9   into evidence, and because plaintiffs did not call Dr. Barras as

10  a witness.  It argues that "[o]pinions based on assumptions must

11  be excluded if they lack a basis in the evidence."  ECF No. 174

12  at 19, citing Guidroz-Brault v. Missouri Pacific R. Co., 254 F.3d

13  825, 830-32 (9th Cir. 2001), and McGlinchy v. Shell Chemical Co.,

14  845 F.2d 802, 807 (9th Cir. 1988).  The government is correct in

15  its general statement of the law, but that statement does not

16  describe what occurred here.

17        McNulty based her testimony on expert reports, not the

18  unsupported assumptions the Ninth Circuit rejected in Guidroz-

19  Brault.  Moreover, the government was in possession of the

20  reports and cross-examined McNulty on those reports.  As the

21  court stated during the trial, McNulty, as an expert, can base

22  her testimony on "anything she wants."  See Fed. R. Evid. 703;

23  Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1262 (9th

24  Cir. 1984) (expert can rely on inadmissible evidence, and it can

25  even be admitted into evidence, although not for the truth of

26  what is asserted there).  If there was a problem with the expert

27  reports that McNulty relied upon, the government had the

28  opportunity to explore that in its cross-examination of McNulty.

1   It did not do so.[32]

2       The government further asserts that any damages award must

3   be reduced by the value of the care relating to the time the

4   Holts were still in Spain.  ECF No. 174 at 21.  The government is

5   correct on this point, as the Holts cannot claim damages for an

6   injury in Spain that did not occur until after they left Spain.

7   The calculation for past care will therefore be reduced by the

8   cost of the care incurred during the 14 months the Holts were

9   still in Spain, or $302,400.[33]

10          **2.   Emotional distress.**

11      Plaintiffs request damages for non-economic damages,

12  pursuant to Cal. Civil Code § 3333.2.  Pl. Tr. Br. (ECF No. 105)

13  at 16.  Such damages are limited to $250,000 for "pain,

14  suffering, inconvenience, physical impairment, disfigurement and

15  other nonpecuniary damage."  Cal. Civil Code § 3333.2(a) & (b).

16  At trial, plaintiffs established the physical impairment of SH,

17  and therefore she is entitled to the statutory maximum.  While

18  there is no direct evidence of the pain and suffering experienced

19  by the parents, common sense and common experience is evidence

20  enough.  Thus the court will award $250,000 for the parents' pain

21  and suffering.  Accordingly, non-economic damages will be

22  $250,000 for SH herself, and an additional $250,000 in total, for

23  the parents' combined pain and suffering.[34]

24  ─────────────────

25  [32] The government's motion to strike McNulty's testimony (ECF
    No. 146) accordingly will be denied.

26  [33] $30 per hour x 24 hours per day x 30 days per month x 14 months
27  = $302,400.

28  [34] The government argues that Mr. Holt should not be awarded

60

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.  CONCLUSION**

For the reasons stated above, the court finds and orders as follows:

1.   The government's motion to strike the testimony of Jenny McNulty (ECF No. 146) is **DENIED**;

2.   Plaintiffs' FTCA claim is not barred by the foreign claim exception of 28 U.S.C. § 2680(k);

3.   Dr. Stahlman, a military doctor acting within the scope of his duties, breached his duty of care to Ms. Holt by clearing her for travel to Spain without investigating further her medical history of premature births and miscarriage, and without making any inquiry on whether the receiving base could handle her situation;

4.   This negligence, and Ms. Holt's subsequent treatment at a base incapable of handling her situation, was the proximate cause of the injuries ultimately suffered by SH and her parents;

5.   Plaintiffs suffered $10,409,700 in damages, as follows,

   a.   $814,028 for SH's lost earnings;[35]

   b.   $1,711,600 for Ms. Holt's costs of care;[36]

---

damages for emotional distress, citing the Feres doctrine. However, the negligent conduct here was the failure of Dr. Stahlman to conduct a proper inquiry into Ms. Holt's medical history, and his failure to ensure that the receiving base had facilities appropriate for Ms. Holt's care.  Plaintiffs are not challenging the command decision to sponsor and pay for the travel of the service-member's family to Spain.  Accordingly, the Feres doctrine does not apply here.  See McGowan v. Scoggins, 890 F.2d 128, 135 (9th Cir. 1989) (Feres precludes civil lawsuits over allegedly negligent command decisions).

[35] This assumes that SH would achieve at least a Bachelor's degree.

1          c.    $7,384,072 for SH's costs of future care;[37]

2          d.    $250,000 for SH's non-economic damages; and

3          e.    $250,000 for Mr. and Ms. Holt's pain and

4    suffering.

5          IT IS SO ORDERED.

6          DATED:   July 2, 2014.

7

8

9

10
                    _____
                    LAWRENCE K. KARLTON
11                   SENIOR JUDGE
                    UNITED STATES DISTRICT COURT
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
     [36] This is $2,014,000 less $302,400, the cost of care in Spain.

27
     [37] This assumes that SH will need to attend private schools.
28

                                   62