UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.H., a minor, by her guardian ad litem Chantal Holt, WILLIAM KENNETH HOLT and CHANTAL HOLT,<br><br>                Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | No. CIV. S-11-1963 LKK DAD<br><br>**AMENDED ORDER** |

        The following is the court's opinion and order after trial.

        In this case the plaintiffs allege medical malpractice on the part of United States Air Force medical personnel.  (Amended Pretrial Conference Order (Final), Undisputed Facts ("Facts") (ECF No. 82) ¶ 1.  Jurisdiction is predicated upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346.

        Plaintiff SH is a minor child who suffers from cerebral palsy.  Facts ¶¶ 33-35.  Plaintiffs' claim is that United States Air Force medical personnel committed malpractice during their treatment of plaintiff Chantal Holt – SH's mother – at Edwards Air Force Base in California (U.S.A.).

1

1    Specifically, plaintiffs assert that even though Air Force

2  medical personnel provided care for, or were aware of Chantal's

3  two premature deliveries, and one miscarriage, they (1) failed to

4  warn Chantal about the added dangers she faced during her then-

5  current pregnancy with SH, (2) failed to prepare her for those

6  dangers, and (3) failed to caution her against traveling overseas

7  to a facility that was not equipped to handle those dangers.

8  Plaintiffs further assert that this malpractice was the proximate

9  cause of SH's premature birth and resulting cerebral palsy.

10   The government's principal defense is that even if

11  plaintiffs were the victims of malpractice by Air Force medical

12  personnel in the U.S., their injury occurred in Spain – where SH

13  was born – and therefore the case falls within the "foreign

14  claim" exception to the FTCA, 28 U.S.C. § 2860(k), depriving this

15  court of jurisdiction.  Alternatively, the government argues that

16  Mr. Holt's claim for emotional distress is barred by the <u>Feres</u>

17  doctrine (<u>Feres v. U.S.</u>, 340 U.S. 135, 146 (1950)).  The

18  government also asserts that its medical personnel did not commit

19  malpractice against plaintiffs, and that there was no causation

20  or damages for which it is liable.

21   For the reasons set forth below, the court finds that the

22  foreign claim exception does not apply here, and that plaintiffs

23  have proven their case on the merits.  Accordingly, judgment will

24  be entered in plaintiffs' favor.

25   **I.   JURISDICTION – THE FEDERAL TORT CLAIMS ACT**

26   **A.   The Law**

27   Because the government's principal defense is

28  jurisdictional, the court addresses it first.  The Federal Tort

2

1   Claims Act ("FTCA"), 28 U.S.C. §§ 1346 & 2671-80, inter alia,

2   grants exclusive jurisdiction to the federal district courts, for

3   civil actions asserting:

> claims against the United States, for money
> damages … for … personal injury … caused by
> the negligent or wrongful act or omission of
> any employee of the Government while acting
> within the scope of his office or employment,
> under circumstances where the United States,
> if a private person, would be liable to the
> claimant in accordance with the law of the
> place where the act or omission occurred.

9   28 U.S.C. § 1346(b)(1).  By its terms the FTCA also makes a

10  sweeping waiver of the government's sovereign immunity in such

11  cases. 28 U.S.C. § 2674 ("The United States shall be liable,

12  respecting the provisions of this title relating to tort claims,

13  in the same manner and to the same extent as a private individual

14  under like circumstances"); U.S. v. Yellow Cab Co., 340 U.S. 543,

15  547 (1951) (the FTCA "waives the Government's immunity from suit

16  in sweeping language"); Millbrook v. U.S., 569 U.S. ___, 133

17  S. Ct. 1441, 1442 (2013) (FTCA "waives the Government's sovereign

18  immunity from tort suits").

19      However, the waiver of sovereign immunity is not all-

20  encompassing.  The FTCA's waiver does not apply to "[a]ny claim

21  arising in a foreign country."  28 U.S.C.A. § 2680(k); U.S. v.

22  Spelar, 338 U.S. 217, 218 (1949) ("The Federal Tort Claims Act is

23  inapplicable by its terms to 'any claim arising in a foreign

24  country'").

25      The purpose of this exemption is to ensure that the United

26  States would not be subject to tort liability as determined by

27  the law of a foreign country:

28      [T]hough Congress was ready to lay aside a

3

> great portion of the sovereign's ancient and unquestioned immunity from suit, it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power.

Spelar, 338 U.S. at 221; Nurse v. U.S., 226 F.3d 996, 1003 (9th Cir. 2000) ("[t]he purpose of the exception is to ensure that the United States is not exposed to excessive liability under the laws of a foreign country over which it has no control").

In this Circuit, and even in the Supreme Court, the "foreign law" problem was avoided simply by applying the FTCA as it was written. Specifically, liability was determined by the law of the place where the negligent act or omission occurred. See 28 U.S.C. § 1346(b)(1) (granting federal jurisdiction in cases where the United States shall be liable "under circumstances where … a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred") (emphasis added);[1] Richards v. U.S., 369 U.S. 1, 9 (1962) ("[i]n the Tort Claims Act Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred").

Under this simple rule, an FTCA claim "arises" in the place where the negligent act or omission occurs – not necessarily in the place where the injury or damage occurs – and that is also the place whose law governs. See Cominotto v. U.S., 802 F.2d

---

[1] Accord, 28 U.S.C. § 2674 ("If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides … for damages only punitive in nature, the United States shall be liable for actual or compensatory damages …").

4

1127, 1129-30 (9th Cir. 1986) ("[u]nder section 2680(k), a tort

claim arises in the place where the negligent act or omission

occurs, not necessarily at the site of the injury or the place

where the negligence has its 'operative effect'");[2] accord,

Richards, 369 U.S. at 10 (expressly rejecting the argument that

"that Congress intended the words 'act or omission' to refer to

the place where the negligence had its operative effect," and

that therefore the law of that place should determine liability).

Under this simple rule, grounded in the language of the

governing statute, when negligent or wrongful conduct occurs

entirely in the United States, the foreign claim exception would

not apply, since liability is governed by the law of the state

where the negligence or wrongful conduct occurred, even if the

damage or injury occurred in a foreign country.  See, e.g., Leaf

v. United States, 588 F.2d 733 (9th Cir. 1978) (section 2680(k)

does not exempt U.S. from liability for negligence in this

country which was alleged to have caused airplane damage in

Mexico).[3]

This rule had the advantage of guaranteeing that foreign law

could never be applied to determine the liability of the United

States under the FTCA, exactly Congress's concern in enacting the

foreign claim exception.  That is because the rule had two parts:

first, the claim arises where the negligent act or omission

occurred; and second, liability was also determined by the law of

the place where the negligent act or omission occurred.

[2] Abrogated by Sosa v. Alvarez-Machain, 542 U.S. 692, 702 (2004).

[3] Abrogated by Sosa.

1   Therefore, if the negligence occurred in the United States, no

2   matter where the injury occurred, liability would be determined

3   by local law within the United States, and the foreign claim

4   exception would not apply.  Similarly, if the negligence occurred

5   outside the United States, even if the injury occurred within the

6   United States, liability would be determined by foreign law, and

7   the foreign claim exception would apply.

8        In Sosa v. Alvarez-Machain, 542 U.S. 69, 707 (2004), the

9   Court again recognized that "[t]he application of foreign

10  substantive law … was … what Congress intended to avoid by the

11  foreign country exception."  Nevertheless, Sosa, without

12  overruling Richards, swept aside the rule – anchored in the

13  statute and Richards – that an FTCA claim "arises" where the

14  negligent act or omission occurs.  In its place, Sosa declared

15  that "the FTCA's foreign country exception bars all claims based

16  on any injury suffered in a foreign country, regardless of where

17  the tortious act or omission occurred."  Sosa, 542 U.S. at 711.

18       However, Sosa did not change the rule that liability is

19  determined by the place where the negligence occurred.  It thus

20  appears to have created the precise situation the Congress tried

21  to avoid in enacting the FTCA.  Specifically, if the injury is

22  suffered in the United States, then the claim is not barred by

23  the exception even if the negligence occurred entirely in a

24  foreign country, and even though foreign law presumably would

25  apply.  Conversely, if the negligence occurred entirely in the

26  United States, but the injury occurred in a foreign country, then

27  even though U.S. law would determine liability, the claim is

28  barred under Sosa.  Sosa went on to expressly reject the argument

1  that the exception should not apply in a situation where U.S. law

2  would determine liability for domestic negligence resulting in

3  injury in a foreign country.  Sosa, 542 U.S. at 710-11.

4      Because "the FTCA's foreign country exception bars all

5  claims based on any injury suffered in a foreign country,

6  regardless of where the tortious act or omission occurred," Sosa,

7  542 U.S. at 711, this case will be barred if, as the government

8  asserts, the complained-of injury occurred in Spain.  As this

9  court has previously determined, however, the burden of

10 establishing that the injury occurred in Spain – and that the

11 foreign claim exception therefore applies – lies with the

12 government.  See ECF No. 59 at 13-14 (order denying summary

13 judgment).  The court therefore turns to the evidence regarding

14 that matter, namely, whether the government has established that

15 plaintiffs' injuries occurred in Spain.

16     **B.    Undisputed Jurisdictional Facts.**

17         1.   Plaintiff SH was born May 12, 2005, at Puerto Real

18 Hospital in or around Cadiz, in Southern Spain.  Facts ¶¶ 33

19 & 34.

20         2.   Plaintiff SH was born at approximately 31 weeks

21 gestation.  Facts ¶ 98.

22         3.   Plaintiff SH exhibited normal "Apgars" blood

23 gasses at birth.  Facts ¶ 99.

24         4.   Plaintiff SH exhibited signs of prematurity,

25 including difficulty eating and breathing.  Facts ¶ 100.

26         5.   Plaintiff SH had to be intubated while in the

27 hospital.  Facts ¶ 101.

28         6.   Plaintiff SH was kept in the neonatal intensive

1    care unit ("NICU") for seventeen days.  Facts ¶ 102.

2         7.   Plaintiff SH was released from Puerto Real

3    Hospital on or about May 30th.  Facts ¶ 105.

4         8.   Plaintiff SH was evaluated at the Landstuhl

5    Medical Center, in Germany, by Dr. L. Smith.  Facts ¶ 110.

6         9.   Plaintiff SH was evaluated by two other doctors in

7    Spain.  Facts ¶ 111.

8         10.  Plaintiff SH underwent an Electro-encephalogram

9    (EEG) while in Spain due to concern about seizures.  Facts ¶ 112.

10        11.  While in Spain, Plaintiff SH was prescribed anti-

11   seizure medication.  Facts ¶ 113.

12        12.  The MRI showed that Plaintiff SH had

13   Periventricular Leukomalacia ("PVL").  Facts ¶ 114.[4]

14        13.  Upon arriving back in the United States, Plaintiff

15   SH was seen at the Medical University of South Carolina ("MUSC")

16   in Charleston.  Facts ¶ 122.[5]

17        14.  SH had access to and received specialty care while

18   in Charleston, South Carolina.  Facts ¶ 115.

19        15.  In late-2006, Plaintiff SH was found to have

20   tetraplegia of all four extremities and other deficits.  Facts

21   ¶ 123.

22        16.  Plaintiff SH was definitively diagnosed with

23   cerebral palsy at the approximate age of 2 years old.  Facts

24   ¶ 116.

25   [4] The MRI was done while plaintiffs were still in Spain.  TR 240

26   (Ms. Holt testimony).

27   [5] Plaintiffs were in Spain "through June 2006," and thereupon
     moved to South Carolina (U.S.A.).  TR 252 (Ms. Holt testimony).

28

17.   Cerebral Palsy is not a disease, but a grouping of non-progressive, non-contagious motor conditions that cause physical disability in human development.   Facts ¶ 117.

18.   Because of her cerebral palsy, Plaintiff SH is significantly disabled.   Facts ¶ 118.

19.   Plaintiff SH has undergone several surgeries as a result of her cerebral palsy.   Facts ¶ 119.

20.   Plaintiff SH will be disabled for life.   Facts ¶ 120.

21.   Plaintiff SH's premature birth is the cause of her cerebral palsy.   Facts ¶ 121.

22.   Plaintiff SH cannot walk without assistance. Facts ¶ 125.

23.   Plaintiff SH has significant cognitive impairment. Facts ¶ 126.

24.   Plaintiff SH has significant mobility impairment. Facts ¶ 127.

25.   Plaintiff SH has significant vision impairment. Facts ¶ 128.

26.   Plaintiff SH will not be able to have gainful employment.   Facts ¶ 129.

**C.   Evidence Regarding Jurisdictional Facts.**

The government argues that SH's injury occurred in Spain because (1) plaintiffs seek damages from "'the day she [SH] was born,'" ECF No. 174 at 7, (2) plaintiffs' required administrative tort claim, filed while plaintiffs were still in Spain, establishes that they are seeking damages for injuries occurring in Spain, and (3) the evidence at trial shows that SH's injury

1  occurred in Spain.

2       **1.   Damages.**

3       The government asserts that Ms. Holt testified that she was

4  claiming damages for SH's injury "'from the day she [SH] was

5  born.'"  ECF No. 174 at 7.  In fact, Ms. Holt withdrew that

6  statement immediately upon uttering it, and instead testified

7  that she did not know what period of time she was seeking damages

8  for:

9            Q. Are you claiming damages for the time that
             you've had to spend taking care of [SH] in
10           this case?

11           A. Yes, sir.

12           Q. Starting from when?

13           A. From the beginning.

14           Q. From the day she was born?

15           A. I would say so. Yes, sir.

16           Q. From the day she was born?

17           A. I don't know. I honestly don't know. I
             would have to see the thing [the Jeannie
18           McNulty (economist) report]. I just -- since
             I haven't seen it, I –
19

20  TR 114.  Thus, Ms. Holt gave two different answers to the

21  question the government quotes, namely, "[f]rom the day she was

22  born?"  Although she initially answers "Yes, sir," she then

23  immediately withdrew her answer, by stating, in response to the

24  same, repeated, question, "I don't know.  I honestly don't know."

25  In other words, Ms. Holt was confused, and did not know what the

26  answer to the question was, notwithstanding her prior answer,

27  which only reflected her confusion.  The court accordingly

28

1  rejects the government's assertion that Ms. Holt's testimony on
2  this issue compels the conclusion that plaintiffs' injury and
3  resulting damages occurred in Spain.

4      The government next asserts that plaintiffs' economic
5  expert, Jennie McNulty, calculated damages from when SH was born,
6  in Spain, and concludes that the injury and resulting damages
7  therefore arose in Spain.  ECF No. 174 at 7.  The government is
8  correct that this was the stated basis for the expert's damages
9  calculation.  However, the government does not explain why this
10 supports its conclusion that the calculation bars plaintiffs'
11 entire claim.  At most, the expert's testimony shows that
12 plaintiffs are seeking damages beyond what they are entitled to.
13 That is, since plaintiffs assert that the injury occurred in
14 South Carolina, they will have some difficulty in explaining why
15 their damages should be calculated from a time that precedes
16 their presence in South Carolina.  However, there is no basis for
17 this court to conclude that even if plaintiffs are seeking more
18 damages than they are entitled to, that they are therefore
19 entitled to no damages whatever.  The court accordingly rejects
20 the government's assertion that McNulty's damages calculation
21 establishes that plaintiffs' claim "arose in Spain and is barred
22 by § 2680(k)."  See ECF No. 174 at 7.

23         **2.   The Administrative Claim.**

24     The government next asserts that plaintiffs' lawsuit is
25 barred by the foreign claim exception because the administrative
26 claim relating to this lawsuit was "signed and submitted" on or
27 about June 9, 2006, while the plaintiffs were still living in
28 Spain.  ECF No. 174 at 8.  The administrative claim sought money

1   damages for, among other things, "catastrophic neurological

2   injuries," "seizures," and "cerebral palsy."  <u>See</u> Exh. 3T

3   (admitted RT 262) at second (unnumbered) page.  The claim

4   requested $100 million in personal injury damages.  <u>Id.</u>, at first

5   page.  That administrative claim is for the damage on which this

6   case is now based.  TR 664 (Ms. Holt testimony).

7        The government therefore argues that plaintiffs have

8   submitted a claim for an injury arising in Spain, and is

9   therefore barred by the foreign claim exception, a jurisdictional

10  bar.  It goes on to argue that if plaintiffs are seeking damages

11  for a claim that arose in South Carolina, they failed to file an

12  administrative claim for it, and therefore are jurisdictionally

13  barred by their failure to exhaust their administrative

14  remedies.[6]

15       Plaintiffs do not agree that the claim form establishes that

16  the injury occurred in Spain.  Rather, they assert that the claim

17  forms were prepared by plaintiffs' counsel in an attempt to

18  preserve plaintiffs' rights, including making sure that they did

19  not lose their claims to the statute of limitations.  Since the

20  presentation of an administrative claim is jurisdictional, it is

21  plaintiffs' burden to establish that they met the administrative

22

23  [6] The court notes that this argument, although jurisdictional, is
    an afterthought by the government.  The government sought summary

24  judgment in this case without ever raising this issue.  It argued
    that the injury occurred in Spain, but did not identify these

25  administrative claim forms as the basis for the argument until
    trial, even though the government has had the forms since June

26  2006.  Nevertheless, since the issue goes to federal
    jurisdiction, the court will consider the argument, even at this

27  late date.

28

                                 12

1   claim requirement of the FTCA.  See Cadwalder v. U.S., 45 F.3d

2   297, 300-01 (9th Cir. 1995).

3       The FTCA waives the government's immunity for tort claims

4   only if the plaintiff has first "presented" the claim to the

5   appropriate federal agency and been turned down.  28 U.S.C.

6   § 2675(a).  This court is required to interpret the

7   Section 2675(a) waiver of federal sovereign immunity "strictly."

8               "[T]he administrative claim requirements of
                Section 2675(a) are jurisdictional in nature,
9               and thus must be strictly adhered to.  This
                is particularly so since the FTCA waives
10              sovereign immunity.  Any such waiver must be
                strictly construed in favor of the United
11              States.  Section 2675(a) establishes explicit
                prerequisites to the filing of suit against
12              the Government in district court.  It admits
                of no exceptions. Given the clarity of the
13              statutory language, we cannot enlarge that
                consent to be sued which the Government,
14              through Congress, has undertaken so carefully
                to limit."
15

16  Cadwalder, 45 F.3d at 300-01 (quoting Jerves v. U.S., 966 F.2d

17  517, 521 (9th Cir. 1992)).

18       It is undisputed that plaintiffs "presented" their FTCA

19  claim to the Air Force in June 2006, while they were still living

20  in Spain.  First Amended Complaint (ECF No. 6) ¶ 4; Answer ¶ 4;

21  RT 252 (Ms. Holt testimony; plaintiffs were in Spain "at least

22  through June" of 2006).  The government's argument is that this

23  fact, standing alone, establishes that SH's injury occurred in

24  Spain.  However, the government cites no case for this

25  proposition, and the court cannot agree with it.

26       The FTCA administrative claim is intended to enable the

27  government to make its own investigation, and to alert it to a

28
                                    13

1   request for a sum certain in damages.  See Cadwalder, 45 U.S. at

2   301.  The Holts' administrative claim does just that in this

3   case.  It alerts the Air Force that plaintiffs were claiming

4   negligence by Air Force medical personnel at Edwards Air Force

5   base, by, generally speaking, failing to warn and prepare

6   Ms. Holt for the dangers her fourth pregnancy presented, given

7   her two prior premature births and one miscarriage.  It further

8   alerts the Air Force that this alleged negligence resulted in

9   $100 million in damages to the plaintiffs as the direct and

10  proximate result of the premature birth.  It further alerts the

11  Air Force of all the possible consequences of its alleged

12  negligence, including "cerebral palsy," and the sum certain that

13  plaintiffs were claiming.

14      The government seems to be arguing that the administrative

15  claim form is an admission by plaintiffs that the injuries

16  identified in the form had already occurred in Spain, since the

17  form was sworn to by plaintiffs, and was prepared with the

18  assistance of counsel.  At trial, counsel for the government

19  pointed out to Ms. Holt that there could be a "civil penalty"

20  attached to signing the form falsely.  TR 263.

21      However, this form, Exhibit 3T, is not what the government

22  says it is.  Exhibit 3T is an administrative claim form.  It does

23  require the claimant to set forth the "basis of claim," in other

24  words:

25              state in detail the known facts and
            circumstances attending the … injury, …
26          identifying persons … involved, the place of
            occurrence and the cause thereof.
27
    Exh. 3T ¶ 8.  It also requires the claimant to
28

14

1
                    state the nature and extent of each injury …
                    which forms the basis of the claim.
2

3    Exh. 3T ¶ 10.

4        Contrary to the clear implication of the government's

5    assertion however, the certification portion of the document does

6    not require the claimant to swear that every identified injury

7    was known to exist at the time of signing.   Rather, it states

8    only:

9                    I certify that the amount of claim covers
                    only damages and injuries caused by the
10                   incident above and agree to accept said
                    amount    in    full    satisfaction    and    final
11                   settlement of this claim.

12   Exh. 3T ¶ 13a.   In other words, the Holts' signature signaled

13   only their agreement to limit their damage claim to whatever was

14   included on the claim form.   Thus, even if cerebral palsy had not

15   yet occurred, the parents had to include a claim for it, or they

16   would be forever barred from seeking damages if or when it did

17   occur, so long as it arose from the negligence identified in the

18   form.   Indeed, in this specific case, the parents – and their

19   counsel who is the person who actually completed this form (TR

20   264) – must reasonably have believed that they were <u>required</u> to

21   list cerebral palsy on the claim form, since one doctor had told

22   them that in his view, SH already had cerebral palsy.   Plaintiffs

23   now assert that this information, from Dr. Shales, was erroneous,

24   as discussed below, but they could hardly have been expected to

25   ignore it when filling out their administrative claim form.

26   Failure to list an injury that had already been identified by

27   their doctor – even if he did so in error – would possibly have

28   forever barred the plaintiffs from seeking damages for cerebral

1   palsy after it actually did occur, so long as it arose from the

2   negligence alleged in the claim form.

3       Moreover, even if the parents did <u>believe</u> that SH had

4   cerebral palsy in Spain, and stated so on the claim form, that is

5   not an "admission" that SH had cerebral palsy.  Whether SH had

6   cerebral palsy in Spain is a medical question which this court

7   will resolve based upon the medical evidence adduced at trial,

8   not based upon whatever belief (mistaken or not) the parents may

9   have had at the time they signed the claim form.

10      Plaintiffs' form accordingly tells us nothing when it comes

11  to the foreign claim exception.  What it does tell us is that

12  plaintiffs listed every injury that their lawyer conceived could

13  possibly result from the negligence alleged in the form.  It does

14  not admit that those injuries have already occurred, nor does it

15  admit that the injuries occurred in Spain.  The claim form, and

16  the plaintiffs' signature thereon, only serves to give the

17  government notice of the alleged negligence, the possible

18  injuries and the claimed monetary damages, so that the government

19  can investigate, and that is all.  Having fulfilled its statutory

20  purpose, the administrative claim does not resurrect itself at

21  trial to trap unwary litigants into making admissions about where

22  an injury occurred for purposes of the foreign claim exception.

23      The government's fallback position is that if the cerebral

24  palsy occurred in South Carolina, then this lawsuit is barred

25  because plaintiffs did not file a separate administrative claim

26  to cover it.  <u>See</u>, ECF No. 174 at 9.  However, the government

27  identifies no case or statute indicating that a new claim is

28  required even when the claim for damages from cerebral palsy is

1    in the claim that was presented, and the cerebral palsy arises

2    from the same negligence that was already identified in the

3    claim.

4        The court finds that the government was already put on

5    notice that its medical personnel negligently treated Ms. Holt,

6    that their negligence resulted in premature birth in a location

7    not equipped to handle it, and that cerebral palsy and its

8    resulting monetary damages, was among the possible injuries that

9    could result from this negligence.  No additional or subsequent

10   administrative claim was required for this lawsuit to proceed.[7]

11              **3.   The evidence at trial.**

12       The government asserts that the evidence at trial

13   "conclusively establishes" that SH was injured in Spain.  ECF

14   No. 174 at 9.  The government first points to the undisputed

15   facts that SH "exhibited signs of prematurity, including

16   difficulty eating and breathing," "had to be intubated while in

17   the hospital," "was kept in the neonatal intensive care unit for

18   seventeen days," and was diagnosed with esotropia.  See ECF

19   No. 147 at 9-10; Facts ¶¶ 100-02.  The government concludes, as

20   to those facts, "[t]hese are injuries."  ECF No. 147 at 10.  They

21   may well be injuries, but they are not the injuries that

22   plaintiffs are suing over.  Nothing in plaintiffs' administrative

23   ───────────────────

24   [7] Plaintiffs allege in their complaint (ECF No. 6) and argue in
     their post-trial brief that medical personnel at Travis AFB and
25   Landstuhl military base were negligent by failing to warn
     Ms. Holt of the dangers she faced in future pregnancies.
26   However, the administrative claims they presented to the
     government alerts the government to alleged negligence only at
27   Edwards AFB.  See Exhibit 3T.  Accordingly, any claims based upon
     negligence at Travis or Landstuhl are jurisdictionally barred.

28

1  claim nor their Complaint alleges that those matters are injuries

2  for which they seek compensation.[8]  They need not be considered

3  further.

4    The government next points to evidence that, it believes,

5  shows that SH "suffered seizures or involuntary shaking of the

6  leg," that the "seizures" were frequent and getting worse in

7  Spain, that SH was placed on powerful anti-seizure medication

8  while in Spain, and that "seizures are an injury."  ECF No. 147

9  at 10.  An examination of the evidence the government identifies

10  for this proposition however, does not reveal evidence showing

11  "conclusively" that SH had "seizures" in Spain.

12    The undisputed facts show that Ms. Holt noticed "shaking in

13  Plaintiff SH's leg while still in Spain."  Facts ¶ 109.  This

14  does not establish that there was any "involuntary" shaking, nor

15  does it establish that the shaking was a "seizure."  The

16  government cites the testimony of Dr. Delgado, TR 606, for its

17  assertion that the "seizures" were frequent and getting worse.

18  ECF No. 147 at 10.  However, Dr. Delgado's cited testimony does

19  not refer to any "seizures."  Rather, he states that Ms. Holt

20  reported "unusual movements" in SH's legs.  TR 604.  In response,

21  Dr. Delgado told Ms. Holt that the movements "had the potential

22             

[8] Indeed, the uncontested testimony in this case is that
23  "esotropia," which is "a problem with muscle control of the
eyes," is "[v]ery common in preterm infants," and is seen "a lot
24  in preterm babies who have no evidence of injury," and "no
neurologic deficit."  TR 70-71 (testimony of Dr. Null) (emphasis
25  added).  Moreover, Mr. Holt also has this condition, and the
Holts apparently do not view it as an injury or anything to sue
26  over.  See TR 256 (Ms. Holt testimony: "My husband had it
[esotropia], too"); 424 (Mr. Holt testimony: "I have it
27  [esotropia]").

28

1   to be <u>consistent</u> with a seizure, and that the information she

2   would provide me would help me figure that out." TR 605

3   (emphases added). Dr. Delgado further testified that he ordered

4   "standard studies to look for seizure activity, an EEG, a brain

5   MRI, and consultation with a pediatric neurologist," and that he

6   "did prescribe something called phenobarbital, which is an anti-

7   seizure medication." TR 605. In other words, Dr. Delgado

8   thought that the leg movements reported by Ms. Holt could

9   possibly be seizures, and that the proper course was to take

10  tests to make a determination, and in the meantime, to prescribe

11  phenobarbital.[9]

12      The government goes on to argue that "the Holts knew that

13  something was 'wrong' with S.H." while they were still in Spain.

14  ECF No. 174 at 10, citing TR at 662:15-18.[10] The government's

15  argument implies that the Holts themselves testified that they

16  knew that something was "wrong" with SH while they were still in

17  Spain. Yet, the cited testimony does not state that. To the

18  contrary, when Ms. Holt was asked when she got "an indication

19  that something might be wrong with Sarah," she testified, "I

20  brought up a, like, a shaking in her leg, and <u>I just wasn't</u>

21  <u>sure</u>." TR 662:15-18. Thus, Ms. Holt's testimony is that she

22  _____

23  [9] Dr. Paul Shales, meanwhile, when asked if he told the Holts
    that SH "had neonatal seizure disorder <u>that was probably</u>

24  <u>resolved</u>," testified, "I did." TR 793-94 (emphasis added). The
    government also neglects to mention that SH was "completely

25  weaned off of phenobarbital" by June 2006, while plaintiffs were
    still in Spain. <u>See</u> Exh. X at US_002057 ¶ 7.

26  _____

27  [10] The government cites "TR. 622:11-14," which appears to be a
    typographical error for "TR. 662:15-18." There is no testimony
    from the Holts on page 622 of the trial transcript.

28

1  "wasn't sure" if something might be wrong with SH, not that "she

2  knew that something was wrong."  See ECF No. 147 at 10 (emphasis

3  added).

4      Moreover, even though the government asserts that "the Holts

5  knew" that something was wrong with Sarah while they were still

6  in Spain, it fails to direct the court's attention to Mr. Holt's

7  testimony on this point, even though "the Holts" refers to both

8  parents.  In fact, when asked, "Isn't it true that you knew

9  something was wrong with her [SH] even if you weren't sure quite

10  what it was," Mr. Holt answered:

11         No.  Again, you're – I think you're implying
            that we knew at that point that there was a
12         life-long condition.  No.  The answer is no.

13  TR 424:25 to 425:4 (emphases added).[11]  "The Holts" did not

14  testify that they knew that something was wrong with SH while

15  they were still in Spain.

16      The government next identifies a purported admission by the

17  Holts that "S.H. had developmental delays in Spain, which they

18  listed as 'severe' when they enrolled her in the Air Force's

19  special needs program, still in Spain."  ECF No. 147 at 10

20  (emphasis added), citing Exhibit 2V and TR 540:1-22.  In fact,

21  ──────────────────────
    [11] Counsel has a duty of candor to the court.  See, e.g., Campbell
22  v. Rice, 408 F.3d 1166, 1175 (9th Cir.) ("A prosecutor, like all
    attorneys, also owes a duty of candor toward a court"), cert.
23  denied, 546 U.S. 1036 (2005).  The court believes that that duty
    is not well served by placing a word in quotation marks and
24  attributing it to a witness who did not actually utter it, and
    who did not adopt the word in her answer to the question where
25  the word was used.  In addition, the court believes that counsel
    should not attribute a quotation to two persons, while citing
26  only to the testimony of one of those persons, especially when
    the testimony of the second person directly contradicts counsel's
27  assertion.

28

1   Exhibit 2V contains no such admission by the Holts.  Mr. Holt's

2   signature on the form is only to identify him as the "sponsor"

3   who is authorizing "the release of information" about SH "to

4   personnel of the Military Departments."  Exh. 2V at US_002548

5   ¶ 1(a)-(d).  Elsewhere on the form is an assertion that SH is

6   eligible for the program because she has "developmental delay"

7   described as "severe."  Id., ¶ 4(b) & 5.  However, that assertion

8   is made by Leslie Fox, an "Early Intervention Specialist," and

9   signed by Fox, not by Mr. or Ms. Holt.  Id., ¶ 6(a) ("name of

10  individual completing this section"), (b) & (i).  It is simply

11  false to assert that this is an admission by the Holts.[12]  The

12  government's reference to Mr. Holt's testimony at TR 504:1-22

13  adds nothing, because it is simply Mr. Holt describing the form

14  and the entries thereon which, as pointed out, were completed by

15  Ms. Fox and contain her assertions, not his.  See TR 504:1-22.

16      The government next asserts that the Holts "knew that an MRI

17  in Spain showed that S.H. had periventricular leukomalacia or

18  'PVL' … which Plaintiffs' expert Dr. Null testified was 'evidence

19  of some injury to the white matter' of the brain."  ECF No. 174

20  at 10, citing Facts ¶ 114 and TR 73:3-6.  It is uncontested that

21  SH had an MRI while the Holts were still in Spain.  The

22  government is correct that, according to the undisputed facts,

23  the MRI, taken in Spain, "showed that Plaintiff SH had

24  Periventricular Leukomalacia ('PVL').  Facts ¶ 114.[13]  However,

---

12  It is additionally false for the government to assert that
25  "they" made this admission, since Ms. Holt's name and signature
26  are nowhere on this form, and there is no reference to her at
27  all.

28  13  This concession by plaintiffs is surprising however, since

21

besides defining what PVL means, the government never establishes that this is an injury that plaintiffs are suing over in this case.  To the contrary, the uncontested testimony of plaintiffs' expert, Dr. David Griesemer, when asked whether the PVL report was "significant evidence of some sort of problem that the child is going to have or presently has," answered:

> <u>No</u>. I think everyone was very cautious not to equate this finding with something that would be necessarily problematic later.  I think the best we get out of anyone, whether it's the radiologist or the neurologist, is this is something that needs to be followed up, we need to look at it later.  <u>It is clearly not a clear prediction of her later diagnosis of cerebral palsy</u>.

TR 316-17 (emphases added).

The government next asserts that SH had "abnormal physical limitations," and a "litany of 'medical problems,'" requiring her to see "'lots and lots of doctors,'" while still in Spain.  ECF No. 147 at 10, citing Mr. Holt's testimony at TR 424:4-14 and 425:23-426:4.  Once again, the cited testimony does not say what the government claims.  First, Mr. Holt did not testify that SH had a "litany" of medical problems, rather he answered "Sure," when asked whether SH "had at least medical problems in Spain." TR 425:23-426:1.  He did testify that SH saw "lots and lots of doctors" in Spain.  TR 426:2-4.  However, the plaintiffs are not suing under the FTCA because SH had unspecified "medical problems" or because she saw lots and lots of doctors; they are

---

their own expert testified that "everyone was sort of hedging around" the question of whether Sarah had a diagnosis of PVL, and that while "the findings are consistent with [PVL], … it's not clearly asserted. … And this was pretty mild and iffy."  TR 316.

1    suing over the catastrophic medical problems they say arose after

2    they returned to the United States, and the life-long medical and

3    other care they claim she will require.

4         Second, Mr. Holt's cited testimony at 424:4-14 does not

5    assert that SH had "abnormal physical limitations," and in fact,

6    he specifically denies that:

> Q. Isn't it true that you understood that she
> had physical limitations while you were in
> Spain?
>
> THE COURT: You mean physical limitations
> different than a child, a newborn child?
>
> MR. BRODERICK: Yes, sir.
>
> THE COURT: Did you know that?
>
> THE WITNESS: I think so. Again, Your Honor,
> we didn't know exactly what was going on. Not
> that we didn't even know exactly what was
> going on, but nobody really could tell us
> specifically, or, you know, they couldn't
> tell us whether she had developmental and
> physical delays that were consistent with a
> child that was, you know, two months
> premature, or were they consistent with a
> child with an actual problem.
>
> Did she have developmental delays? Yes,
> that's fair.  But I mean, again, she had
> episodes, and she was on phenobarbital, and
> that could be part of that.  I mean, we just
> -- nobody knew what was going on.

21   TR 424 (testimony of Mr. Holt).

22        The government next asserts that "the Holts testified" that

23   "they knew that S.H. was 'not developing like her other two

24   siblings had,' even though the other siblings were also

25   premature."  ECF No. 147 at 10, citing TR 774:19-21.[14]  Once

26

27   [14] The government cites "Tr. at 775:17-23," which appears to be a
     typographical error.

28

1    again, the cited evidence is not quite as the government

2    describes it.  First, the cited testimony is from Dr. Shales, not

3    "the Holts."  Second, the Holts were never called to testify as

4    doctors nor as expert witnesses on child development.

5    Accordingly, their apparent concern about SH's development, as

6    reported to Dr. Shales, does not move the case forward at all on

7    whether SH had cerebral palsy while still in Spain.[15]

8         The government next relies on SH's referral to "Early

9    Development Intervention Services," and the conclusions contained

10   in Exhibit D, an "Early Intervention Developmental Evaluation."

11   ECF No. 147 at 10.  The government asserts that SH was referred

12   for these services based on her "manifest problems in Spain."

13   Id.  The cited testimony however, establishes that Dr. Delgado

14   referred SH for those services, but it does not establish what

15   problems were the basis for the referral.  See TR 607:10-12.  The

16   court does not know what the government is referring to when it

17   refers to "manifest problems."  However, Dr. Delgado's testimony

18   immediately prior to his referral testimony concerned Ms. Holt's

19   concerns about SH's leg shaking, eye movements, and whether SH

20

_____

21   [15] Indeed, the government's repeated reliance on observations and
     admissions of the Holts makes for a very unconvincing case on

22   this issue.  As the government itself asserts, the question on
     the foreign claim exception is where the claim occurred.  Yet,

23   the government repeatedly relies on observations or concerns from
     the parents, even though it has offered no basis for the court to

24   conclude that the Holts could possibly make the medical
     determination of when or where the injury occurred.  The court

25   notes that Ms. Holt is currently enrolled in school, aiming to
     get into pharmacy school.  TR 82 (Ms. Holt testimony).  There is

26   no evidence that she is a doctor.  Mr. Holt is in "aircraft
     maintenance."  TR 386 (Mr. Holt testimony).  There is no evidence

27   that he is a doctor.

28

1   was achieving development milestones according to the "standard

2   timeline based upon her age."   None of these things identify

3   "injuries" that plaintiffs are suing over.   The leg shaking and

4   eye movement issue ("esotropia") are discussed above.   There is

5   nothing in the cited testimony, or the testimony leading up to

6   it, that establishes that at the time of the referral, SH had

7   developmental deficits, as opposed to temporary developmental

8   delays common to premature infants.   Ms. Holt's reported concerns

9   and observations about SH's development do not establish that SH

10   had "learning deficits" or any of the other injuries plaintiffs

11   are suing over.

12       The government, quoting Exhibit D, asserts that the Holts

13   knew that SH had "'motor skills that were significantly delayed

14   when compared with other children of her own age,' even

15   correcting for S.H.'s prematurity," because this evaluation was

16   read aloud to them.[16]   ECF No. 147 at 10.[17]   However, nothing in

17   the evaluation states or implies that SH's significantly delayed

18   motor skills are, or will lead to, the catastrophic, life-long

19   motor deficits that plaintiffs are suing over.   Rather, the cited

20   evaluation was done 7 months after SH was born, at a time when

21   her evaluation age – adjusted for her prematurity – was just 5

22

23   [16] The court notes the government's emphasis in this section of
     its brief to what the Holts knew and when they knew it.   As the
24   government itself argues, this issue goes to whether the statute
     of limitations should be tolled, which is not in issue here.   The
25   court will consider the government's arguments here to be
     asserting what conditions SH had, not simply what conditions her
26   parents knew about.

27
     [17] See also, Exh. D at US_001910 ("[a]ll testing took into
28   consideration S.H.'s adjusted age for prematurity").

months.  See Exh. D at US_001905 ("Chronological Age: 7 months,"

"Adjusted Age: 5 months").  To the contrary, the cited

evaluation, while establishing that SH qualified for "Early

Intervention services" because of her "delays in the areas of

motor and problem-solving skills," never states that SH is

permanently or catastrophically injured in regard to her motor

skills.  Rather, it establishes that at the early stage SH was

evaluated, she was "at risk for developing motor problems

including cerebral palsy."  Id., at US_001910 (emphasis added).

     The government next cites Exhibit X for the proposition that

the Holts knew that SH "required and received physical therapy,

speech therapy (for feeding), and occupational therapy, all while

in Spain," and that plaintiffs went to Germany to get a pediatric

neurological evaluation for SH.  ECF No. 147 at 10.  Aside from

the "occupational therapy," the government's assertion appears to

be correct.[18]  However, it does not establish that SH had any of

the injuries the plaintiffs are suing over now.  The government

has offered no evidence to show that a child who receives

physical and speech therapy at 13 months necessarily has cerebral

palsy, or some other catastrophic and permanent injury.  The

government is also correct that the evidence shows that

plaintiffs went for a pediatric neurologic exam in Germany while

they were still living in Spain.  However, going for an exam is

not itself evidence of the permanent and catastrophic injuries

---

[18] As for "occupational therapy," Exh. D indicates that there was
an "evaluation/assessment," but it offers no explanation of what
that could mean for such a young child.  In any event, it does
not state that SH, then a 13-month old child, "received"
occupational therapy.  See Exh. D at US_002060 ¶ 13.

that plaintiffs are suing over now.  As discussed above, the

evidence does show that SH was "at risk" for such injuries, but

at this point, while plaintiffs were still living in Spain, the

evidence thus far does not tend to show that those injuries had

yet occurred.

The government next cites Dr. Delgado for the proposition

that plaintiffs "returned to the U.S. some two years early due to

S.H.'s manifesting problems, for which S.H. would need

specialized care not available to her in Spain."  ECF No. 147

at 10, citing TR 622:5-19.  The cited testimony, by Dr. Delgado,

was that:

> Over the course of my interactions with the
> family and with the other pediatric
> specialists on the base, the conclusion was
> that Sarah would eventually need services
> that we couldn't offer there. And so we had
> to take active measures to provide the family
> with paperwork that they would submit that
> would trigger an early return.

TR 622:13-18.  This testimony is consistent with the evidence,

discussed above, that SH's parents and doctors were concerned

that she was "at risk" for serious injuries, including cerebral

palsy, and that there was a possibility that other serious

injuries could eventually develop.  The evidence, including Dr.

Delgado's account, thus leads to the reasonable inference that

the parents decided to transfer to a place that would be prepared

to deal with these eventualities if they did occur.  There is no

reasonable inference from this evidence that those injuries had

already occurred at the time the parents decided to leave Spain.

The government next asserts that plaintiffs' own evidence

1   shows that SH received a "brain injury" at birth, and in any

2   event no later than one year after birth, and therefore the

3   injury occurred in Spain.  ECF No. 147 at 11.  The government is

4   correct that the uncontested evidence allows the court to

5   conclude that SH received a brain injury at birth, and that this

6   was the injury that resulted in her cerebral palsy.  See TR 69-70

7   (Dr. Null testimony: SH's cerebral palsy resulted from an injury

8   or insult to her brain that probably occurred at birth, or within

9   six months of birth).  Indeed, it is undisputed that "Plaintiff

10  SH's premature birth is the cause of her cerebral palsy."  Facts

11  ¶ 121.

12      The government's argument that this requires application of

13  the foreign claim exception is predicated however, on its

14  misrepresentation of the holding of the principal Supreme Court

15  case governing this issue, Sosa.  According to the government,

16  the Supreme Court "explained" in Sosa that "a claim arises in

17  'the jurisdiction in which injury was received.  Sosa, 542 U.S.

18  at 705 (emphasis added).'"  ECF No. 147 at 11.  However, the

19  Supreme Court "explained" no such thing.  Rather, in reaching its

20  actual holding, the Court surveyed what other courts, academics

21  and treatises had to say, and in the course of so doing, quoted a

22  1962 article published in the Florida Law Review:

23          A commentator noted in 1962 that, for the
            purposes of these borrowing statutes, "[t]he
24          courts unanimously hold that a cause of
            action sounding in tort arises in the
25          jurisdiction where the last act necessary to
            establish liability occurred"; i.e., "the
26          jurisdiction in which injury was received."
            Ester, "Borrowing Statutes of Limitation and
27          Conflict of Laws," 15 U. Fla. L. Rev. 33, 47.

28

1  Sosa, 542 U.S. at 705 (emphasis added).  The government's

2  assertion that the court must look to where the injury was

3  "received," is supported only by the author of the quoted law

4  review article, not by the Supreme Court in Sosa.

5       Moreover, the Supreme Court in Sosa did not simply adopt the

6  law review's language.  Rather, the Court continued its survey of

7  other ways to describe where the claim arose, referring to the

8  following: "where [the] cause of action arose, or accrued, or

9  originated," "courts generally applied the law of the place where

10  the injury occurred," "[the conflicts of laws rule] is to apply

11  the law of the place of injury to the substantive rights of the

12  parties," "defendant's liability determined by 'the law of the

13  place of wrong,'" and "'the place where the harmful force takes

14  effect upon the body.'"   Sosa, 542 U.S. at 705-06 (some emphases

15  added) (quoting Richards, 542 U.S. at 11-12, American Law Reports

16  and the Restatement (First) of Conflict of Laws).

17       By focusing on where the injury is "received," the

18  government essentially excludes plaintiff's theory that the court

19  should look to where the injury first "manifested" itself.  That

20  is because the place where the injury was "received" is also "the

21  jurisdiction where the last act necessary to establish liability

22  occurred," according to the law review article, namely, the

23  premature birth.

24       Ultimately, Sosa held that "the FTCA's foreign country

25  exception bars all claims based on any injury suffered in a

26  foreign country."  The question then, is whether the injury

27  plaintiffs are suing over was "suffered" in Spain or in the

28  United States.  The government has failed to show that they were

1   suffered in Spain, because the brain injury the government refers

2   to is not the injury plaintiffs are suing over.  As discussed

3   above, the premature birth and resulting brain injury would not

4   necessarily lead to the cerebral palsy and catastrophic

5   neurological injuries plaintiffs are suing over.  The uncontested

6   evidence is that those events may be the cause of the eye issue,

7   and early developmental delay, neither of which plaintiffs are

8   suing over.

9       The question of where SH suffered the injury plaintiffs are

10  suing over is determined by federal law, as the government

11  asserts, because it goes to the applicability of an FTCA

12  exception.  The problem is that neither side has directed the

13  court to any case describing where the injury is suffered for

14  purposes of the foreign claim exception, other than Sosa.  While

15  Sosa provides the guiding principle involved here – the claim

16  arises where the injury is suffered – it does not tell us where

17  the injury was suffered in this case.  In Sosa, the injury

18  plaintiff was suing over – false arrest – plainly occurred in

19  Mexico.  See Sosa, 542 U.S. at 698 (Sosa sued under the FTCA

20  "alleging false arrest," and plaintiff's arrest "was said to be

21  'false,' and thus tortious, only because, and only to the extent

22  that, it took place and endured in Mexico").[19]

23

---

24  [19] The location of the injury was not at issue in Sosa, since the
     false arrest (or kidnapping) took place in Mexico, and that false
25  arrest was what the plaintiff was suing over.  The issue in Sosa
     was whether the location of the negligent or wrongful act
26  governed where the claim "arose" for purposes of the foreign
     claim exception.  The Court held that the claim "arose" not where
27  the negligence occurred, but where the injury occurred.

28

1    Accordingly, this court, following the Supreme Court's lead

2  in Sosa, looks to cases addressing statutes of limitations to

3  determine when and where the injury occurred. "[I]t is 'the

4  standard rule that [accrual occurs] when the plaintiff has 'a

5  complete and present cause of action.'" Wallace v. Kato, 549

6  U.S. 384, 388 (2007).

7         "Under the traditional rule of accrual ...
          the tort cause of action accrues, and the
8         statute of limitations commences to run, when
          the wrongful act or omission results in
9         damages. The cause of action accrues even
          though the full extent of the injury is not
10        then known or predictable." 1 C. Corman,
          Limitation of Actions § 7.4.1, pp. 526–527
11        (1991) (footnote omitted).

12 Wallace, 549 U.S. at 391.[20]  Although the applicability of the

13 foreign claim exception is determined by federal law, one aspect

14 of it is dependent upon the law of the place where the negligence

15 occurred, namely California. Specifically, in asking where the

16 "injury" happened, we must look to the law of California to

17 determine what is an injury. That is because the law of

18 California governs liability and therefore determines where the

19 injury sued on occurred in the first place. See 28 U.S.C.

20 § 1346(b).

21    Under California law, "injury" is defined "as the point at

22 which appreciable harm [from the negligence] was first

23 manifested. To be 'manifested,' the damage from the negligence

24 must ha[ve] made itself known in some outward fashion." Katz v.

25 ──────────────────

26 [20] "Were it otherwise, the statute would begin to run only after a
   plaintiff became satisfied that he had been harmed enough,
27 placing the supposed statute of repose in the sole hands of the
   party seeking relief." Wallace, 549 U.S. at 391.

28
                              31

1   <u>Children's Hosp. of Orange County</u>, 28 F.3d 1520, 1526 (9th

2   Cir. 1994) (citations and some internal quotation marks omitted).

3   Accordingly, applying federal law, we know that the foreign

4   exception applies where the "injury" occurred.  But, applying

5   California law, we know that the "injury" occurs where it first

6   "manifests" itself.

7       The government argues that the injuries sued over were

8   manifest in Spain, citing "seizures," white matter brain damage,

9   "severe" developmental delay, and esotropia.  However, as

10   discussed above, the government has not shown the presence in

11   Spain of the catastrophic neurological damage or cerebral palsy

12   that plaintiffs are suing over.  The government has not shown the

13   existence of "seizures."  Rather, it has shown only that Ms. Holt

14   reported leg shaking, which plaintiffs are not suing over.

15   Although SH was prescribed phenobarbital, which can control

16   seizures, it was apparently prescribed as a preventive, and in

17   any event, SH was "weaned" from it while still in Spain.  The

18   developmental delay noted in the infant in Spain is not described

19   anywhere as the "severe" developmental delay that occurred in the

20   United States.  As noted above, plaintiffs are not suing over her

21   esotropia, a condition her father lives with and does not seem to

22   consider to be an injury to be sued over.  Plaintiffs are suing

23   over catastrophic neurological damage and cerebral palsy, which

24   the government has not shown existed in SH while she was in

25   Spain.

26       The government next asserts that Dr. Shales "told" the

27   Holts, while they were still in Spain, that SH had cerebral

28   palsy.  <u>See</u> TR 793.  The government is correct, and indeed, this

1   evidence is uncontested.  However, the evidence is not

2   particularly probative of anything.  Dr. Shales was the

3   "developmental pediatrician" at Rota who examined and treated SH

4   in Spain.  TR 772-73.  He was not a pediatric neurologist.

5   TR 800.  Indeed, there is nothing in the evidence adduced at

6   trial that would allow this court to conclude that Dr. Shales was

7   qualified to make such a diagnosis.  The court cannot simply

8   infer from his status as doctor, or as a developmental

9   pediatrician, that he was qualified to make a proper evaluation

10  of SH's neurologic system development, or to diagnose cerebral

11  palsy.  See TR 45 (Dr. Null expert testimony, cerebral palsy "has

12  to do with the development of their neurologic system"); TR 296

13  (Dr. Griesemer expert testimony, pediatric neurology deals with

14  cerebral palsy, among other brain, spinal cord, muscle and nerve

15  issues).

16       In addition, although Dr. Shales told the Holts that Sarah

17  had cerebral palsy, there is no evidence in the record to explain

18  why he told them that.[21]  Thus, the evidence does not show whether

19  this statement reflects his own diagnosis (even if he were

20  qualified to make it), or he was simply repeating what someone

21  else told him, or whether he was telling them something he had

22  

23  [21] This deficiency arose because the government failed to comply
    with the rules that would have permitted him to testify as an
24  expert, or to at least give expert testimony as a treating
    physician.  See Fed. R. Civ. P. 26(a)(2)(C).  Accordingly,
25  Dr. Shales was able to testify only about communications he had
    with plaintiffs, and was precluded from testify about any
26  underlying reasons, which would have required him to give expert
    testimony.  See Republic of Ecuador v. Mackay, 742 F.3d 860, 865
27  n.1 (9th Cir. 2014).

28

1  read in a medical chart.  Finally, even if Dr. Shales had been

2  qualified to make this diagnosis, far more convincing evidence in

3  the record shows that Dr. Shales's statement was incorrect, and

4  that SH did not, in fact, have cerebral palsy at the time Dr.

5  Shales said she did.

6      Dr. David Griesemer is a board certified doctor in pediatric

7  neurology, is in charge of the pediatric neurology departments at

8  two hospitals in North Carolina, treated SH in South Carolina,

9  examined all the medical records relating to SH, and testified as

10  an expert in this case.  RT 294-95, 296-97.  Dr. Griesemer

11  discussed in some detail the examination that Dr. Shales had

12  made, and concluded that "there was nothing on his exam that

13  provided any evidence of cerebral palsy."  RT 324-25.  To the

14  contrary, the medical records show that upon birth, SH "was doing

15  well."  RT 309.  There was no evidence of "hypoxic ischemic

16  injury or anoxic brain injury."  RT 309.  Moreover, looking at

17  all the records that Dr. Shales had available to him, Dr.

18  Griesemer concluded that "there is nothing in the medical record

19  that allows him to draw that conclusion [that SH had cerebral

20  palsy]."  RT 329.

21      It appears that at least some of what Dr. Shales told the

22  Holts came from an examination by Dr. Smith, a pediatric

23  neurologist.  However, Dr. Smith's report did not state that SH

24  had cerebral palsy:

25          Q. BY MS. E. STEFFIN: Now, you had described
        Dr. Smith's examination of Sarah, and that

26          was, again, Exhibit 2T, Defendant's Exhibit
        2T, that we already looked at.  What you're

27          telling me then is it doesn't appear that
        there is a new exam here?

28

1
2
3
4
5
6
7
8

    A. No. I think his [Dr. Shales's] current diagnosis, number one, basically parrots what Dr. Smith observed in her examination, you know, at six-and-a-half -- I'm sorry -- at 9 months of age. So, I mean, the words are exactly the same as in Dr. Smith's note.

    Q. Except in Dr. Smith's note, did she make that diagnosis?

    A. No, I'm sorry. The words hypotonia in the trunk and dynamic hypertonia in all extremities is taken directly from her note. The diagnosis of cerebral palsy was not in her note.

9  TR 328-29. Indeed, one of the "hallmark" or "cardinal" findings

10  needed to establish the existence of cerebral palsy is "increased

11  tone." TR 318. However, "that cardinal finding of cerebral

12  palsy on Dr. Smith's examination was absent." TR 318. Other

13  hallmarks of cerebral palsy – such as leg scissoring, adductor

14  tightness, pathologically increased reflexes – were not present

15  in Dr. Smith's report. RT 319-20.

16    As to the MRI that was taken in Spain, that also did not

17  show the presence of cerebral palsy:

18
19
20
21

    THE COURT: Can I go back, Doctor. About to demonstrate how much I know. Given the finding, is that in your mind – do you have an opinion as to whether that is significant evidence of some sort of problem that the child is going to have or presently has?

22
23
24
25
26

    THE WITNESS: No. I think everyone was very cautious not to equate this finding with something that would be necessarily problematic later. I think the best we get out of anyone, whether it's the radiologist or the neurologist, is this is something that needs to be followed up, we need to look at it later. It is clearly not a clear prediction of her later diagnosis of cerebral palsy.

27   TR 316-17.

28    Indeed, it is undisputed that cerebral palsy is a grouping

of non-progressive, non-contagious motor conditions that cause

physical disability in human development.  Facts ¶ 117.  Put

another way, in general "cerebral palsy actually describes

symptoms caused by some brain insult or injury."  TR 66 (Dr. Null

expert testimony) (emphasis added).  Accordingly, this is not

like a disease that might exist in the body but not be

discovered, through outward symptoms, until some time later.  In

this case, the outward symptoms are the condition of cerebral

palsy, so if they are not observable, or manifest, then the

condition is not there:

> THE COURT: … If a child is not -- in Sarah's case -- is not exhibiting the classic symptoms of CP, is it fair to say – I know that defense counsel will ask this more carefully than I can -- is it fair to say she doesn't have it, CP is not yet present, or it's simply disguised in some way? Is that a good question?
>
> THE WITNESS [Dr. Griesemer]: Well, it's not disguised, but it's not manifest.
>
> THE COURT: Okay.  I understand now.
>
> THE WITNESS: You know, when we talk about making a diagnosis of CP, it's got to be something that we can ascertain, that we can see, and it's got to be something that's a problem.
>
> THE COURT: I got you.
>
> THE WITNESS: And at this point it was neither.  We couldn't see it, and it really wasn't a problem, and so everyone said, well, let's just keep her on our watch list.

TR 322.

    The evidence shows that SH's cerebral palsy did not manifest

itself until she was in South Carolina:

1    THE COURT: When was she first diagnosed with
     CP, Doctor, if you can tell me?
2
     THE WITNESS: Neither of the pediatric
3    neurologists in South Carolina, neither Dr.
     Barbosa nor Dr. Livingston, used the term
4    cerebral palsy, but both of them suspected
     that she had spastic diplegia, and so that
5    would be a type of cerebral palsy.

6    THE COURT: And that would be roughly at what
     age?
7
     THE WITNESS: That would be at 16 to 17 months
8    of age, which is about right. You know, it's
     creeping up on that 18-month period where a
9    diagnosis is makeable.

10   TR 330-31 (Griesemer).  Thus, the government's distinction

11   between when a disease exists and when it is diagnosed is not so

12   easily applicable to cerebral palsy, which is not a disease, but

13   a group of symptoms or manifestations.  The uncontested expert

14   evidence of Dr. Griesemer shows that if those symptoms are not

15   manifest, then the condition does not exist.  In this case, there

16   were symptoms that were consistent with premature birth, and with

17   conditions that a premature child could grow out of.  It was not

18   until plaintiffs arrived in South Carolina that symptoms appeared

19   that doctors could identify as cerebral palsey.

20       The government next asserts that SH had "white matter brain

21   damage" while in Spain.  (ECF No. 174 at 14.)  The question

22   however, is whether there was any manifestation of that damage

23   while plaintiffs were in Spain.  The government identifies no

24   evidence establishing that the issues the plaintiffs dealt with

25   in Spain – leg shaking, developmental delay at 7 months and

26   esotropia – are manifestations of "white matter brain damage,"

27   rather than ordinary, temporary manifestations of premature

28   birth.

                                37

**D.   Conclusion – Jurisdiction.**

The court accordingly concludes that the government has not met its burden to show that the injuries plaintiffs are suing over occurred in Spain.   To the contrary, the evidence shows that SH's cerebral palsy occurred in South Carolina.   The government's motion to dismiss this case on the basis of the foreign claim exception will therefore be denied.

## II.   THE MERITS

Plaintiffs are suing the United States for "medical malpractice" under the FTCA, the government's waiver of sovereign immunity for such claims.   Under the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances."   28 U.S.C. § 2674. Liability is determined "in accordance with the law of the place where the [negligent] act or omission occurred."   28 U.S.C. § 1346(b).   In this case, plaintiffs assert that the negligent acts and omissions occurred in the United States, namely, Dr. Stahlman's approval, at Edwards Air Force Base, of the Holts' application for overseas screening, without determining whether it was appropriate to give this approval given her then-current pregnancy, and her three prior problematic pregnancies.

Under California law, the elements of a claim for medical malpractice are

> "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence."

1  Gami v. Mullikin Medical Center, 18 Cal. App. 4th 870, 877 (2nd

2  Dist. 1993) (quoting Budd v. Nixen, 6 Cal. 3d 195, 200 (1971)).

3      **A.   Duty**

4      The government argues that plaintiffs cannot establish the

5  first element of their claim because Ms. Holt was not a patient

6  of Dr. Stahlman, and therefore he did not owe her any duty.  The

7  government is correct that an "essential element" of plaintiffs'

8  lawsuit is "the establishment of a duty owed to [Ms. Holt] by the

9  physician."  Keene v. Wiggins, 69 Cal. App. 3d 308, 312 (4th

10 Dist. 1977).  The government next argues that the only way to

11 establish this duty in a medical malpractice case is through the

12 physician-patient privilege, citing Keene.[22]  Keene expressly does

13 not stand for this proposition when it comes to California law:

14         It is well established by authorities in
           other states the physician is liable for
15         malpractice or negligence only where there is
           a relationship of physician-patient as a
16         result of a contract, express or implied.

17 Keene, 69 Cal. App. at 313 (emphasis added).  Keene goes on to

18 state:

19         In California, however, the courts have not
           used status alone as a means of determining
20         liability.

21 Keene, 69 Cal. App. 3rd at 313.  Rather, under California law:

22         The fundamental principle is all persons are

23 ─────────────────────

[22] The government also asserts that plaintiffs "conceded" the
24 point in their Trial Brief.  ECF No. 174 at 15.  The parties
   certainly can concede or stipulate to factual matters, and the
25 court will generally respect such a concession.  The same is not
   true for concessions on the state of the law.  The court always
26 hopes that the parties' trial briefs and post-trial briefs will
   be helpful, but it is the court's job to rule on what the law is,
27 not the parties.

28
                              39

1         required to use ordinary care to prevent
        others being injured as a result of their
2         conduct and any departure from this principle
        involves the balancing of a number of
3         considerations, namely:

4         (a) the foreseeability of harm to the
        plaintiff;
5

6         (b) the degree of certainty the plaintiff
        suffered injury;

7         (c) the closeness of the connection between
        the defendant's conduct and the injury
8         suffered;

9         (d) the moral blame attached to the
        defendant's conduct;
10

11         (e) the policy of preventing future harm;

12         (f) the extent of the burden to the defendant
        and consequences to the community of imposing
        a duty to exercise care with resulting
13         liability for breach; and

14         (g) the availability, cost, and prevalence of
        insurance for the risk involved.
15

16 _Keene_, 69 Cal. App. 3d at 312 (citing _Rowland v. Christian_, 69

17 Cal. 2d 108, 112 (1968)).  A final factor to be considered is

18 "the extent to which the transaction was intended to affect the

19 plaintiff." _Keene_, 69 Cal. App. 3d at 312 (citing _Biakanja v._

20 _Irving_, 49 Cal. 2d 647, 650 (1958)).

21     In _Keene_, the employer hired the doctor "solely to conduct

22 an examination [of the plaintiff] for purposes of rating

23 disability compensation benefits." _Keene_, 69 Cal. App. 3d

24 at 314.  The court expressly recognized that "[t]he person under

25 examination is seeking benefits from the employer's carrier and

26 is pursuing a claim adverse to the interests of the employer."

27 _Id._ (emphasis added).  In applying the _Rowland_ and _Biakanja_

28 factors to the case before it, the _Keene_ court found that the

doctor did not "seek[] to provide a benefit" to the plaintiff, it
was "not foreseeable a claimant in a workers' compensation case
would, without question, accept and rely upon medical reports of
the employer's insurance carrier." Id.   Moreover, the
examination "was solely for the carrier's benefit in the
adversary workers' compensation proceedings," and there was no
evidence that the doctor "voluntarily offered Keene any advice
and counsel or otherwise intended to benefit Keene personally."
Id., at 316.   Accordingly, the court concluded that the doctor
owed the plaintiff "no duty of professional skill in connection
with the report" the doctor prepared for the plaintiff's
employer.   Keene, 69 Cal. App. 3d at 316.

This case is fundamentally different from Keene.   According
to the evidence adduced at trial, when an Air Force service-
member is preparing to be transferred overseas, and he has
dependents whom he would like to accompany him at government
expense, the Air Force conducts an "overseas screening."[23]
TR 497-98 (Copeland testimony).   This screening was conducted by
(1) a special needs coordinator, who had to have a degree in
social work, or be a registered nurse, or the like, but was not
an "administrative person," and (2) a "medical review officer,"
who had to be a physician or a physician's assistant under the
supervision of a physician.   TR 500:7-16.

The purpose of this screening was to "identify if there were
any obvious contraindications to sending the family together as a

---

[23] This assumes that the transferee location is one where
dependents in general can go, that is, excluding places like
Afghanistan.   TR 498:12-16.

1  unit."  TR 501.  Specifically, it was to identify whether the

2  dependent has any special needs, and whether those needs can be

3  met at the receiving location.  TR 501-02.  If a special need was

4  identified, that would trigger two things.  First, it would

5  trigger a "Facilities Determination Inquiry."  TR 502 & 503.

6  Second, it would trigger an inquiry into whether the service

7  member is already enrolled in the Exceptional Family Member

8  Program, and if not, an evaluation for enrollment in that program

9  would commence.  See TR 503.

10      The overall purpose of this process, unsurprisingly, is

11  "ultimately because of the military mission."  TR 510.  That is,

12  if a service-member has dependents with special needs that are

13  not being met at the overseas location, that will distract the

14  service-member, and might even require the return of the family

15  from the overseas location, all to the detriment of the military

16  mission.  RT 509 & 510.  However, the means of ensuring that the

17  military mission is not compromised in these situations, is to

18  protect the "family member's well-being" while the service-member

19  and the family are overseas.  TR 509.

20      Viewing all this in the context of the Rowland factors, this

21  court finds that Dr. Stahlman owed a duty to Ms. Holt to conduct

22  the screening with the due care expected of a physician.  The

23  harm to Ms. Holt was foreseeable, indeed avoiding such harm was

24  the reason the screening was done in the first place – to avoid

25  foreseeable harm to military depends going to live overseas.  The

26  very existence of this screening program is an acknowledgment

27  that some Air Force bases are not medically appropriate for some

28  dependents, and that sending them there would harm them, thereby

42

1  harming the military mission.

2      Further, it is undisputed here that the plaintiff suffered
3  an injury, and as discussed below, the evidence shows that it was
4  proximately caused by Dr. Stahlman's conduct.  The court finds
5  that the policy of preventing future harm would be well served by
6  ensuring that the medical screening process is not simply a
7  "rubber-stamping" of the service-member's request to bring his
8  family with him overseas.  Moreover, the court is aware of no
9  additional burden to the community by requiring that the doctor
10 exercise due care in conducting the screening.

11     Finally, the court finds that the screening process was
12 intended to benefit Ms. Holt.  It is true that the ultimate goal
13 of the screening was to benefit the Air Force, but that ultimate
14 goal was to be achieved by ensuring the well-being of the
15 service-member's family.  Thus, in stark contrast to the Keene
16 case, the physician here was not conducting a screening during an
17 adversary proceeding with plaintiffs.

18     The government's citation to Mero v. Sadoff, 31 Cal.
19 App. 4th 1466, 1471 (2d Dist. 1995), is equally unavailing.  That
20 case held that a doctor was liable to a plaintiff for medical
21 malpractice, despite the absence of a physician-patient
22 relationship, where the doctor injured the patient during the
23 course of a physical examination.  The case confirms the
24 principle that the existence of a physician-patient relationship
25 is not, in every case, required to find medical malpractice.

26     Felton v. Schaeffer, 229 Cal. App. 3d 229, 234-35 (4th
27 Dist. 1991), also relied upon by the government, does not compel
28 a different result.  Despite its broad language, Felton involved

43

a physical examination that resulted in <u>economic</u> harm when the
doctor negligently examined the plaintiff in the context of a
pre-employment examination.   In <u>Felton</u>, the doctor's negligence
resulted in plaintiff not getting a job.   Here, the alleged harm
was medical, precisely the type of harm sought to be avoided by
the medical screening.

The court concludes that Dr. Stahlman had a duty to screen
Ms. Holt with the due care expected of a physician.

**B.   Breach.**

**1.   Undisputed Facts.**

a. In or about 1998, Plaintiff Chantal Holt gave
birth to her first child ("MH") while her husband was stationed
at Travis Air Force Base, in Solano County, California.   Facts
¶ 15.

b. Plaintiff Chantal Holt experienced preterm
contractions and preterm labor with her first child.   Facts ¶ 16.

c. Plaintiff Chantal Holt's first child was born
at approximately 32 weeks.   Facts ¶ 17.

d. In or about 2000, Plaintiff Chantal Holt gave
birth to her second child ("LH") while her husband was stationed
at a military installation in Germany.   Facts ¶ 18.

e. Plaintiff Chantal Holt's second child was born
at Landstuhl Medical Center, Germany.   Facts ¶ 19.

f. Plaintiff Chantal Holt experienced preterm
contractions and preterm labor with the second child.   Facts
¶ 20.

g. Plaintiff Chantal Holt received care from
Dr. Hildebrand, a specialist at Landstuhl Medical Center, while

pregnant with her second child.  Facts ¶ 21.

            h. Plaintiff Chantal Holt's second child was born at approximately 34 weeks.  Facts ¶ 22.

            i. Plaintiff Chantal Holt's second child spent several days in the neonatal intensive care unit immediately after birth.  Facts ¶ 23.

            j. Plaintiff Chantal Holt's second child exhibited difficulties associated with prematurity, including difficulty breathing and eating, but suffered no long-term effects from the premature birth.  Facts ¶ 24.

            k. Prematurity is considered to be birth earlier than 37 weeks.  Facts ¶ 26.

            l. Having a history of premature births puts any subsequent pregnancy at a higher risk of premature birth.  Facts ¶ 27.

            m. Children born prematurely are at higher risk for neurological and other medical conditions, including cerebral palsy.  Facts ¶ 28.

            n. Plaintiff SH is the third child of Plaintiffs Ken and Chantal Holt.  Facts ¶ 29.

            o. On or before October 15, 2004, Plaintiff Ken Holt received notice that he would be transferred to the USAF Air Mobility Squadron at Rota Naval Station, in or around Cadiz, Spain.  Facts ¶ 36.

            p. In or about October 31, 2004, Chantal Holt contacted Nurse Practitioner Spikowski ("NP Spikowski") at Edwards AFB and told NP Spikowski that she had tested positive for pregnancy.  Facts ¶ 37.

1    q. NP Spikowski advised Plaintiff Chantal Holt to

2 stop taking certain medications at that time, and referred her

3 for a pregnancy test.  Facts ¶ 38.

4    r. Plaintiff Chantal Holt underwent a pregnancy

5 test at the Edwards APB medical clinic.  Facts ¶ 39.

6    s. The pregnancy test confirmed that Plaintiff

7 Chantal Holt was pregnant on or about November 2, 2004.  Facts

8 ¶ 40.

9    t. NP Spikowski told Plaintiff Chantal Holt on or

10 about November 2, 2004, that she should see Nurse Hobby to get a

11 prescription for prenatal vitamins and to schedule a new

12 pregnancy meeting.  Facts ¶ 41.

13    u. At the new pregnancy meeting, Plaintiff Chantal

14 Holt was given a list of civilian medical providers for her

15 pregnancy care.  Facts ¶ 42.

16    v. Plaintiff Chantal Holt chose Dr. Bansi Vora, a

17 civilian doctor, for her pregnancy-related medical care.  Facts

18 ¶ 43.

19    w. In or about November 2004, Edwards APB medical

20 staff gave plaintiff Chantal Holt a referral to Dr. Vora for her

21 pregnancy-related medical care.  Facts ¶ 44.

22    x. Dr. Vora is not an employee of the United

23 States.  Facts ¶ 45.

24   **2.   Findings of Fact**

25   **a.   Travis AFB and Landstuhl.**

26  The uncontested evidence shows that after Ms. Holt's first

27 pre-term delivery, the medical personnel at Travis did not "make

28 a really big deal about it."  TR 85.  The child, MH, was placed

in the NICU for 12 hours for monitoring, and plaintiffs were then sent home thinking they had had "the same experience everybody else had."  TR 85.

The uncontested evidence also shows that prior to Ms. Holt's second preterm delivery, she was hospitalized twice at Landstuhl, and given IV drugs to prevent her preterm contractions. RT 87-88.  After the premature birth of LH, the child was placed in the NICU for "[b]etween three and four" weeks.  RT 89. Although this was Ms. Holt's second premature birth, the medical personnel at Landstuhl, including Dr. Hildebrand, did not give Ms. Holt any information or warnings about future births. TR 88-89; Facts ¶ 21.  Instead, they told Ms. Holt her two premature births "don't appear to be related."  RT 89.

The evidence further shows that because of Ms. Holt's two prior pre-term deliveries, "she was at very high risk to have a subsequent preterm delivery.  And therefore, it was critical that she be informed of that risk factor."  TR 33 (Dr. Null testimony).[24]

### b.   Edwards AFB.

In late summer 2001, Mr. & Ms. Holt, MH and LH moved to Edwards Air Force Base in California.  RT 89.  During their time there, and before Ms. Holt became pregnant with SH, Ms. Holt had a miscarriage (sometimes referred to in the record as a "spontaneous abortion").  RT 646 (video deposition of Mr. Holt read at trial).

---

[24] The government objected to this testimony as outside the scope of his expert report, but the objection was overruled.  TR 33-35.

1    In October 2004, Mr. Holt was notified that he would be
2 transferred to Spain for at least three years.  TR 389-90.
3 Mr. Holt accordingly completed a "RIP" form on which he listed
4 his wife and two children, whom he wanted to accompany him on his
5 overseas assignment.[25]  RT 390-92 (Mr. Holt testimony); 499-500
6 (Copeland testimony).  Mr. Holt and his family were thereupon
7 scheduled for an overseas screening session.  RT 93 (Ms. Holt
8 testimony).

9    Ms. Holt's pregnancy with SH was confirmed by Air Force
10 medical personnel, on or about November 2, 2004.[26]  The overseas
11 screening session took place a few days later, on November 5,
12 2014.  See TR 465-66 (Stahlman testimony); Tr. Exh. 48 (clearance
13 for travel form).  It was conducted by Dr. Stahlman and by Major
14 Clark (now deceased).  RT 465.

15    The purpose of the screening was to determine whether the
16 dependents "had any medical problems that the gaining base would
17 be unable to take care of."  TR 450 (Stahlman testimony).  In
18 order to carry out this function, the doctor (and coordinator)
19 spoke with the dependents and reviewed their medical records.
20 TR 450.  If during this process, the doctor identified any
21 medical concerns, or anything he wasn't sure might be a medical

22
23 [25] No witness could say what the acronym "RIP" stood for.
However, Mr. Holt believes it starts with "Record of Individual
24 …."  TR 390.  It appears to be "a … notification that you're
being looked at for a specific assignment."  TR 498 (Copeland
25 testimony).

26 [26] The undisputed facts and the testimony are unclear about
whether November 2nd was the date of the pregnancy test, with the
27 results coming later, or whether it was the date that the results
were known.
28

48

1  concern, he would investigate further and "review the medical

2  record more in depth."  TR 451-52.[27]

3      One of the issues the doctor would look at, if he knew the

4  patient was pregnant, was whether she "had any significant

5  medical or OB problems."  RT 453, 459 (would only investigate

6  further if he knew the patient was pregnant).  If there remains

7  an issue as to whether the receiving base could handle a medical

8  issue relevant to a dependent, then the doctor would request to

9  have that information sent "to the gaining base so that they can

10  review it."  TR 453.  That "review" would be to determine if the

11  receiving base could handle the medical issue.  TR 42 (Null

12  testimony).  One such medical issue that would cause the doctor

13  to get further information about the dependent is if he learned

14  that the dependent had had two previous premature births and a

15  prior miscarriage:

16          THE  COURT:  Right.  But  in  your  screening
           position, if you learned -- actually, either
17          from  the  records  or  from  the  conversation
           with the dependent that she had had previous
18          premature  --  or  two  previous  premature
           births,  what  would  that  tell  you,  if
19          anything, in terms of your job, I mean?

20          THE   WITNESS:  We're   just   talking   in
           generalities, correct?
21
           THE COURT: Yes.
22
           THE WITNESS: Correct. You would have to get
23          further history of exactly what was going on
           with those pregnancies and exactly what kind
24          of problems were going on, yes.

25  ──────────────
   [27] The government now blames the late Major Clark for any
26  deficiencies in the overseas screening.  See ECF No. 147 at 17 &
   n.8.  Dr. Stahlman's own evidence shows, however, that he had a
27  role – to investigate further – and that he (not Major Clark)
   failed to investigate further.

28

1          THE COURT: So at minimum, what would happen
           is if you learn that had there had been
2          prematures, the next question you would have
           tried to ascertain was what was the nature
3          and what was the problem?

4          THE WITNESS: Correct.

5    TR 454-55.

6          The uncontested evidence in this case is that at the time

7    Dr. Stahlman conducted the overseas screening for the Holt

8    family, Ms. Holt had already had two premature deliveries on U.S.

9    military bases under the care of U.S. military medical personnel,

10   as well as a miscarriage.  The evidence shows that all of this

11   information was documented in her medical records which were

12   provided to, and reviewed by Dr. Stahlman prior to, or at the

13   time of, the screening.  See RT 467 (information from patient

14   visits are placed directly into the patient's medical records).

15   However, Dr. Stahlman did not do what he himself said he was

16   required to do, and what Dr. Null said must be done under the

17   standard of care, namely, investigate further, and determine

18   whether the receiving base could handle a person with Ms. Holt's

19   OB history.  This conduct plainly did not meet the standard of

20   care.

21         The government resists this conclusion by asserting that

22   "there is no evidence that Col. Stahlman knew that Mrs. Holt was

23   pregnant."  ECF No. 147 at 17.  The assertion is simply false,

24   because there is evidence that Dr. Stahlman knew that Ms. Holt

25   was pregnant.  Even if the government believes the evidence is

26   insufficient or should not be believed, it is simply false to

27   assert that there is "no evidence" of it.

28         The evidence is uncontested that Ms. Holt's pregnancy test

1   was done by Air Force medical personnel at Edwards Air Force

2   Base.  It is uncontested that this test result was entered into

3   Ms. Holt's medical records kept by the Air Force.  It is

4   uncontested that Ms. Holt's medical records were provided to

5   Dr. Stahlman, for his review, prior to the screening.

6       The government nevertheless asserts that Dr. Stahlman did

7   not have access to the laboratory records showing Ms. Holt's

8   pregnancy until after November 5th.  ECF No. 174 at 17.  That may

9   be, but what happened to the official, paper laboratory results

10  is not determinative of what Dr. Stahlman knew, or when he knew

11  it.  Even assuming that Dr. Stahlman did not see the records from

12  the laboratory prior to the screening, the undisputed facts of

13  this case establish that Carla Spikowski knew that plaintiff was

14  pregnant on or about November 2, 2004, and told Ms. Holt, on that

15  date, "that she should see Nurse Hobby to get a prescription for

16  prenatal vitamins and to schedule a new pregnancy meeting."

17  Facts ¶ 41.

18      In order for Dr. Stahlman to know nothing of Ms. Holt's

19  pregnancy, not only would the lab results need to still be in

20  transit and not yet in the official records, but Spikowski must

21  have failed to enter this obviously important medical development

22  into Ms. Holt's medical records.  Dr. Stahlman's own testimony

23  refutes this possibility.  He testified that when a person was

24  seen in a clinic, the medical personnel would enter the notes

25  from that visit into the medical records that day, even if the

26  results of a lab test would not be entered until days later:

27          Q. … Okay. And so do you know how often those
            records were updated, the paper charting that
28          was done?

51

1      A. Well, normally, they would be pulled when
       a patient was seen in the clinic, and those
2      notes from that visit would be put in the
       record.

3
       Q. Do you know if that would take
4      approximately 24 hours or more before a
       patient had been seen and the paper chart to
5      make it to that individual's records?

6      A. Well, normally, if you saw a patient in
       the clinic, the papers from that visit would
7      be put in the record that day.

8      THE COURT: Directly? You'd have the records
       there.  You would put whatever you're – I
9      don't mean you personally – the doctor would
       make whatever notes he made, and put it right
10     in the record?

11     THE WITNESS: That's correct.

12     Q. BY MS. BERG: Was there a more lengthy
       process for lab results before they would
13     make it into the actual paper records?

14     A. Right. So lab results would have to be
       sent from the lab to the central record area,
15     and they might not be filed for a day or two,
       or several days. If the record had been
16     pulled out of clinic for another visit, then
       it might take a little while for those two to
17     match up.

18   RT 467-78.  In other words, there is no reason to think that

19   Dr. Stahlman only knew information contained in an official,

20   paper laboratory report.  Rather, he would also know what was

21   entered into the medical record by Ms. Holt's other providers,

22   including Spikowski.  There is no basis for believing that

23   Spikowski would have withheld this information, and the

24   government does not assert that she did.

25       In any event, the evidence is contradictory on whether the

26   official, paper lab report would have made it into the records

27   reviewed by Dr. Stahlman in time.  The government cites

28   Dr. Stahlman's testimony that lab results "might not be filed for

1  a day or two, or several days."  See TR 468 (Stahlman testimony).

2  But the government makes no reference to, nor does it attempt to

3  refute the testimony of, Spikowski, who does not suffer the

4  obvious bias that Dr. Stahlman does:

5           Question: And so if he - let me represent to
            you that he signed off on seeing her on
6           November 5th.  So is it fair to say that he
            would have had access to those medical
7           records demonstrating she was pregnant on
            November 2nd?
8
            Answer: That's a fair assumption.
9
    RT 429-30 (videotaped deposition testimony of Spikowski).
10
11       In addition, the evidence shows that Dr. Stahlman was told

12  in the screening room that Ms. Holt was pregnant, and that he

13  discussed it with her.  Ms. Holt testified as follows:

14           We got in there, and we sat down. [LH], as
            soon as we sat down, announced that he was
15           going to be a big brother, which opened the
            conversation with the gentlemen.
16
            They said that -- the niceties that you get
17           when someone announces that. And I told them
            that it was early on.
18  RT 94.  Thus, Ms. Holt's direct, eye-witness testimony is that

19  Dr. Stahlman was told of Ms. Holt's pregnancy, and discussed it

20  with her.

21       This testimony is uncontested.  Dr. Stahlman's testimony

22  plainly showed that he did not specifically recall meeting

23  Ms. Holt and her children for the screening.  See TR 458-65.  All

24  of Dr. Stahlman's testimony regarding that screening were derived

25  from the documents he was shown, and none of it came from his own

26  memory.  Finally, his testimony established that he did not

27  remember, one way or the other, whether he discussed Ms. Holt's

28  pregnancy with her:

1

Q. Okay. Do you have any recollection of
whether or not you had a conversation with
Mrs. Holt about pregnancies? And if you don't
recollect, that's fine. I'm just asking.

2

3

A. I do not.

4

5 TR 465.

6     The government asserts that Dr. Stahlman "testified that he

7 did not know that Mrs. Holt was pregnant."  ECF No. 147.  That is

8 not a fair description of his testimony.  After testifying that

9 he did not recall having a conversation with Ms. Holt about her

10 pregnancy, Dr. Stahlman then testified "I do not believe" that he

11 saw the pregnancy lab reports, and "I do not believe that I knew

12 that the patient was pregnant."  TR 479 & 480.  However neither

13 of these statements even purports to come from his own memory.

14 They are based upon the fact that Dr. Stahlman did not make a

15 further investigation or request an FDI, and his belief that he

16 would have done so if he knew that Ms. Holt was pregnant.

17     The court finds that Dr. Stahlman knew that Ms. Holt was

18 pregnant, and that Ms. Holt had had two prior premature

19 deliveries and a miscarriage.  The court further finds that Dr.

20 Stahlman breached his professional duty of care to Ms. Holt by

21 failing to investigate further her OB history, and failing to

22 take any steps to ensure that her overseas travel would not

23 endanger her or SH.

24     **C.   Causation.**

25     Plaintiffs assert that the Air Force medical personnel's

26 failure to warn Ms. Holt of the dangers inherent in future

27 pregnancies, and its decision to let her travel to Spain without

28 determining whether the facilities there were adequate to deal

54

1  with her pregnancy, was the proximate cause of SH's injuries.

2  They presented clear expert evidence to this effect:

3              BY MR. BERMAN: Now, Doctor, assume that they
             didn't approve her, assuming that she didn't

4            go to Spain, all right, do you have an
             opinion as to whether or not she would have

5            still delivered prematurely? …

6            MR. BRODERICK: Object. That's outside the
             scope.

7

8            THE COURT: Overruled. You may answer.

9            THE WITNESS: I think based on the two
             previous preterm deliveries where she did
             have early labor, or the appearance of early

10           labor, and was managed appropriately by
             perinatal individuals, and didn't deliver

11           extremely early, that I think there is very
             clear evidence that she would not have

12           delivered at the gestational age she
             delivered at.

13

             …

14

15           THE COURT: And that is, in your view, a
             delayed delivery would have avoided, would
             most likely have avoided the consequences

16           that Sarah now suffers?

17           MR. BRODERICK: And we'll respectfully object
             to the Court's question as outside the scope

18           as well.

19           THE COURT: I understand that, and
             unfortunately – well –

20

21           THE WITNESS: The answer is, it absolutely
             would have avoided that, yes, sir.

22  TR 41-42 & 42-43 (Dr. Null expert testimony).

23      The government asserts that there is no causation because

24  Ms. Holt received "appropriate" care in Spain.  However, while

25  there is no evidence that Ms. Holt was the victim of malpractice

26  in Spain, the evidence is clear that Ms. Holt did not receive

27  care in Spain that was appropriate for her dangerous pregnancy.

28  Appropriate care for a person in her condition would be prenatal

care addressing the danger, ready access to a NICU and specialists who deal with premature deliveries.  See RT 64.  None of this was available at the base where Ms. Holt got her care in Spain.  Id.  The government's assertion that appropriate care was available at a base in a nearby country (Germany), and at a private hospital in Spain that was not required to accept Ms. Holt,[28] does not address the fact that Ms. Holt was sent for care to an inappropriate facility.[29]

While there is no evidence (or allegation) that the care Ms. Holt received in Spain was negligent in any way, the evidence does show that the facility where she was treated was not capable of handling the issues she faced.  It did not have a NICU and it did not have perinatal care available for Ms. Holt.  TR 64 (Ms. Holt testimony).  It had only one NICU nurse and none of the equipment that would be needed for a premature birth infant, such as proper-size intubation equipment or breathing tubes.  TR 102. Overall, it was not equipped to prevent a premature birth or to handle a premature birth.  TR 658-59.

As the direct result of these deficiencies, after Ms. Holt was already in preterm labor, she had to be rushed, by ambulance, to a facility capable of handling the situation.  TR 658-59.  Had

---

[28] According to Ms. Holt's testimony, it took three hours for Rota personnel to find a hospital capable of handling a premature birth, and willing to accept her.  RT 102.  Moreover, this was taking place on the day she had the emergency C-section.

[29] The same issue would arise if Ms. Holt had been sent to a facility that had only podiatrists available.  Those doctors could well have practiced their craft perfectly, but it is not the care that plaintiff needed.

appropriate specialists and facilities been in place at Rota,
where Ms. Holt received her treatment, the traumatic, premature,
emergency C-section that Ms. Holt and SH endured would "more
likely than not" have been avoided.  TR 42.  Had that trauma been
avoided, it is likely that SH's subsequent injuries would not
have occurred, either.  TR 42-43.

The court finds that the government's negligence in clearing
Ms. Holt for travel to Rota, Spain, without making any effort to
determine if the facility was adequate for her needs, was the
proximate cause of the injuries that eventually befell SH.

**D.   Damages.**

**1.   Cost of care and lost earnings.**

Plaintiffs offered the expert testimony of Jenny McNulty, an
economic consultant, in support of its damages calculation.
RT 356.  She was subject to voir dire by the government, which
established that her opinions were "premised on the reports of
Dr. Barras and Dr. Ancell."  TR 359.  The government established
that McNulty would not give opinions "as a life-care planner,"
and that she would not give "opinions as to life expectancy" or
as to "vocational rehabilitation."  TR 359-60.  McNulty would
testify only "in an economic capacity."  RT 360.  After its voir
dire, the government announced that it was "fine with her
testimony."  TR 360.

McNulty accordingly calculated SH's "projected loss of
earnings."  TR 372.  She relied upon U.S. Census Bureau data, and
the Ancell expert report, assuming that without her injuries, SH
would have earned an Associate's or Bachelor's degree, and would
work for a typical number of years.  TR 373-74.  Her calculation

1  for lost earnings came to $620,945, using the Associate's degree

2  assumption, and $814,028, using the Bachelor's degree assumption.

3  TR 373-74.

4      McNulty next calculated the value of Ms. Holt's time spent

5  caring for SH.  TR 374-76.  She assumed that Ms. Holt cared for

6  SH 24 hours a day, every day from the day SH came home from the

7  NICU, excluding time SH spent in "the 4-K Head Start program,"

8  and excluding time SH spent in school.  TR 375.  McNulty used a

9  valuation for Ms. Holt's time of $30 per hour, which is based

10  upon the expert report of Dr. Barras.[30]  RT 375.  McNulty's

11  calculation of Ms. Holt's time came to $1,860,497 through June

12  2013, or $2,014,000 through March 2014.  TR 375-76.

13      McNulty next calculated the value of SH's future care

14  expenses.  RT 376-77.  This calculation is based upon the expert

15  report of Dr. Barras, which included costs for "surgeries to

16  medical needs, seeing doctors, to also equipment, wheelchairs, et

17  cetera, as well as nursing – the nursing attendant needs, and

18  then also educational needs."  RT 376-77.  McNulty's calculation

19  of these costs came to $7,023,383, if SH attended public school,

20  and $7,384,072, if she went to private school.

21      The government did not challenge any of McNulty's testimony

22  during its opportunity to cross-examine her and it did not object

23

---

24  [30] The government asked McNulty how her calculations would be
    affected if the rate used were $18.50 per hour, instead of $30
25  per hour.  TR 378.  However, the government did not adduce
    evidence that the $18.50 rate was the correct rate to use.  The
26  only reference to that rate appears to be Ms. Holt's testimony
    that that rate would apply if she were to get "respite" care, but
27  which she says she is not entitled to.  TR 113.

28

to her testimony after conducting a voir dire of her.  After

McNulty's testimony, the government moved to strike it, and in

its post-trial brief, the government asserts that McNulty's

testimony should be disregarded because the expert report of

Dr. Barras, upon which her testimony was based, was not admitted

into evidence, and because plaintiffs did not call Dr. Barras as

a witness.  It argues that "[o]pinions based on assumptions must

be excluded if they lack a basis in the evidence."  ECF No. 174

at 19, citing Guidroz-Brault v. Missouri Pacific R. Co., 254 F.3d

825, 830-32 (9th Cir. 2001), and McGlinchy v. Shell Chemical Co.,

845 F.2d 802, 807 (9th Cir. 1988).  The government is correct in

its general statement of the law, but that statement does not

describe what occurred here.

McNulty based her testimony on expert reports, not the

unsupported assumptions the Ninth Circuit rejected in Guidroz-

Brault.  Moreover, the government was in possession of the

reports and cross-examined McNulty on those reports.  As the

court stated during the trial, McNulty, as an expert, can base

her testimony on "anything she wants."  See Fed. R. Evid. 703;

Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1262 (9th

Cir. 1984) (expert can rely on inadmissible evidence, and it can

even be admitted into evidence, although not for the truth of

what is asserted there).  If there was a problem with the expert

reports that McNulty relied upon, the government had the

opportunity to explore that in its cross-examination of McNulty.

It did not do so.[31]

---

[31] The government's motion to strike McNulty's testimony (ECF
No. 146) accordingly will be denied.

1    The government further asserts that any damages award must

2    be reduced by the value of the care relating to the time the

3    Holts were still in Spain.  ECF No. 174 at 21.  The government is

4    correct on this point, as the Holts cannot claim damages for an

5    injury in Spain that did not occur until after they left Spain.

6    The calculation for past care will therefore be reduced by the

7    cost of the care incurred during the 14 months the Holts were

8    still in Spain, or $302,400.[32]

9        **2.   Emotional distress.**

10       Plaintiffs request damages for non-economic damages,

11   pursuant to Cal. Civil Code § 3333.2.  Pl. Tr. Br. (ECF No. 105)

12   at 16.  Such damages are limited to $250,000 for "pain,

13   suffering, inconvenience, physical impairment, disfigurement and

14   other nonpecuniary damage."  Cal. Civil Code § 3333.2(a) & (b).

15   At trial, plaintiffs established the physical impairment of SH,

16   and therefore she is entitled to the statutory maximum.  While

17   there is no direct evidence of the pain and suffering experienced

18   by the parents, common sense and common experience is evidence

19   enough.  Thus the court will award $250,000 for the parents' pain

20   and suffering.  Accordingly, non-economic damages will be

21   $250,000 for SH herself, and an additional $250,000 in total, for

22   the parents' combined pain and suffering.[33]

---

24   [32] $30 per hour x 24 hours per day x 30 days per month x 14 months
25   = $302,400.

26   [33] The government argues that Mr. Holt should not be awarded
     damages for emotional distress, citing the <u>Feres</u> doctrine.
27   However, the negligent conduct here was the failure of
     Dr. Stahlman to conduct a proper inquiry into Ms. Holt's medical
28   history, and his failure to ensure that the receiving base had

1

2

### III. CONCLUSION

For the reasons stated above, the court finds and orders as

3

follows:

4

1.  The government's motion to strike the testimony of

5

Jenny McNulty (ECF No. 146) is **DENIED**;

6

2.  Plaintiffs' FTCA claim is not barred by the foreign

7

claim exception of 28 U.S.C. § 2680(k);

8

3.  Dr. Stahlman, a military doctor acting within the scope

9

of his duties, breached his duty of care to Ms. Holt by clearing

10

her for travel to Spain without investigating further her medical

11

history of premature births and miscarriage, and without making

12

any inquiry on whether the receiving base could handle her

13

situation;

14

4.  This negligence, and Ms. Holt's subsequent treatment at

15

a base incapable of handling her situation, was the proximate

16

cause of the injuries ultimately suffered by SH and her parents;

17

5.  Plaintiffs suffered $10,409,700 in damages, as follows,

18

    a.   $814,028 for SH's lost earnings;[34]

19

    b.   $1,711,600 for Ms. Holt's costs of care;[35]

20

    c.   $7,384,072 for SH's costs of future care;[36]

21

---

22

facilities appropriate for Ms. Holt's care.  Plaintiffs are not

challenging the command decision to sponsor and pay for the

23

travel of the service-member's family to Spain.  Accordingly, the

Feres doctrine does not apply here.  See McGowan v. Scoggins, 890

24

F.2d 128, 135 (9th Cir. 1989) (Feres precludes civil lawsuits

over allegedly negligent command decisions).

25

26

[34] This assumes that SH would achieve at least a Bachelor's

degree.

27

[35] This is $2,014,000 less $302,400, the cost of care in Spain.

28

1          d.    $250,000 for SH's non-economic damages; and

2          e.    $250,000 for Mr. and Ms. Holt's pain and

3    suffering.

4        IT IS SO ORDERED.

5        DATED:  July 7, 2014.

6

7

8

9

10       LAWRENCE K. KARLTON
         SENIOR JUDGE
11       UNITED STATES DISTRICT COURT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27 ──────────────────────────────────────────
[36] This assumes that SH will need to attend private schools.
28